[Crim. No. 1763. Second Appellate District, Division Two.—July 25, 1929.]

THE PEOPLE, Respondent, v. EVAN B. SEITZ, Appellant.

Paul W. Schenck for Appellant.

U. S. Webb, Attorney-General, and Lionel Browne, Deputy Attorney-General, for Respondent.

THOMPSON (IRA F.), J.—The defendant was found guilty and sentenced on three charges of robbery, two counts of "attempt to commit robbery," and one of burglary. He appeals from the judgments pronounced upon the verdicts and from the order denying his motion for a new trial.

Inasmuch as it is one of appellant's contentions that error was committed by the court in permitting the district attorney to amend the information we shall, before reciting any of the testimony, examine that question. The original information consisted of fifteen counts containing not only the charges upon which the appellant was convicted, but ten others, the nature of which ten it is unnecessary to state at this time. A demurrer and a motion to set aside the information as to each count except the first one, which accused the defendant of robbery, were interposed, the latter on the ground that the defendant had not been committed by a magistrate for any offense except that alleged in count I. The motion was denied. The demurrer was sustained as to counts VI, XII, XIII, XIV and XV, the only one in which we are interested being the sixth, which contained the charge of burglary upon which the appellant was convicted. The defendant entered his plea of "not guilty" to all the counts remaining. This was on February 9, 1928. On February 21, 1928, an amended information was filed containing count VI, in the same words as in the original information. A new demurrer and motion to strike based on the same grounds as before were interposed and on September 11, 1928, the demurrer was overruled and the motion to strike denied. At the same time the defendant's motion for a separate trial from his co-defendant was granted. The defendant was not required nor did he plead to the amended information.

The appellant assigns two reasons why the action of the trial court was erroneous: First, as already sug-

gested, the district attorney had no authority to include in the information an offense not covered by the magistrate's commitment; second, that the district attorney had no authority to amend after demurrer sustained without an order of court therefor. The record does not disclose for what offense or offenses the appellant was bound over by the committing magistrate. Appellant asserts that the opinion of the trial judge, delivered when denying the motion to strike, evidences the fact that the magistrate only held him to answer for the offense of robbery contained in count I. Even though we were entitled to consider the opinion, we would not find the support which is claimed for it. Therein it appears that it is conceded that the information contains charges for which the defendant was not committed, although it "embraces *charges* for which the" defendant was committed. It is to be noted that the word charges is in the plural and we have no way of ascertaining which were embraced in the order and which were not. If it were desired to raise the objection on appeal the record should have been made to reflect the situation. Without such record we must indulge all the presumptions in favor of the judgment. It should be presumed, in the absence of a contrary showing that the charges not covered by the order are the remaining nine counts with which we are not · here concerned. ■ The same reasoning, however, does not apply to the second point presented. We do not need to concern ourselves with the first five counts which were identical with the first five counts of the original information, the demurrer to which was overruled and to which the appellant plead, but only with count VI, the demurrer to which was sustained and to which he did not plead. The order sustaining the demurrer appears in the record and from it, it does not appear that the district attorney was authorized or permitted to amend in any particular. Section 1009 of the Penal Code in the chapter on demurrers reads: "If the court does not permit the information to be amended, nor direct that an information be filed, or that the case be resubmitted, as provided in the preceding section, the defendant, if in custody, must be discharged, or if admitted to bail, his bail is exonerated, or if he has deposited money instead of bail, the money must be refunded to him." It is apparent

that had the demurrer to the entire information been sustained without permission to amend, the defendant would have stood discharged. It must likewise follow as to the single count. The entire situation as respects count VI, inclusive of appellant's failure to plead thereto, is such that the judgment responsive thereto cannot be allowed to stand.

██ We have concluded that the opinion will advance more logically if we consider certain other claims of error before proceeding to test the sufficiency of the evidence. Accordingly, the next argument to which we will turn is that relating to the impeachment of a witness named Rosen. This witness testified at the preliminary examination to the fact that in several conversations with the appellant the latter had attempted to induce him to undertake "something safe" at a "tea party" where "there were some women" who "wore a lot of diamonds, no holler to it, all covered by insurance and everything fixed." Between the time of the preliminary examination and the trial, Rosen had been murdered. Pursuant to the provisions of section 686 of the Penal Code the district attorney read in evidence the testimony of this witness given at the preliminary hearing. The appellant then attempted to show by at least two witnesses that both before the preliminary examination and while outside the courtroom and afterward, Rosen had said on many occasions that his testimony would be, was and had been wholly and utterly false and a "frame-up" between himself and the person to whom we shall hereafter refer as the "Iron Duke," an accomplice. The trial court rejected the testimony in its entirety, i. e., that which purported to have occurred prior as well as subsequent to the examination. In *People* v. *Garnett*, 9 Cal. App. 194 [98 Pac. 247], a witness was absent from the state and her deposition given at the preliminary hearing was introduced by the district attorney. In passing upon a similar contention there, it is said: "The court sustained the objection of the district attorney to questions put to the witness George N. Martin for the purpose of showing that Mrs. Coit had made statements to him inconsistent with the evidence read from her deposition. There was no error in this. No foundation had been laid for the impeachment of Mrs. Coit as required

by section 2052, Code of Civil Procedure. The fact that her testimony was read from her deposition taken at the preliminary examination, does not alter the rule. (*People v. Compton*, 132 Cal. 484 [64 Pac. 849]; *People v. Witty*, 138 Cal. 576 [72 Pac. 177]; *People v. Pembroke*, 6 Cal. App. 588 [92 Pac. 668].)"

The quoted portion of the opinion would seem to leave no doubt of the correctness of the ruling in so far at least as concerns statements made prior to the giving of the deposition, for the obvious reason that in such cases the opportunity was afforded counsel to lay the necessary foundation for the impeachment. In *People v. Compton, supra*, the statements inconsistent with the testimony which were sought to be introduced were made subsequent to the preliminary examination and the court dismissed the appellant's contention with the observation: "We know of no rule of law justifying the impeachment of the witness under these circumstances." This brief statement is unsatisfactory to the inquiring mind not enslaved by the force of precedent. However, we do find a logical and just reason for the exclusionary rule in the words of Chief Justice Brinkerhoff in the case of *Runyan v. Price*, 15 Ohio St. 1, 14 [86 Am. Dec. 459], as follows: "If we look at the principal question decided in this case simply as one of judicial policy, without reference to the authority of adjudged cases, it seems to me that a reason, in addition to any that I have yet heard stated may be found in favor of our conclusion in the following considerations:

" 'Dead men tell no tales'; and if the rule be once established that the testimony of a deceased witness may be impeached by giving in evidence declarations alleged to have been made by him out of court differing from those contained in his testimony, and when he has had no opportunity for explanation—when all opportunity for explanation by him has passed away—when few will have the motive, and none the power to vindicate his integrity and truthfulness such as he would have if living, it seems to me that temptations to perjury and subornation would be not a little increased by the comparative impunity with which those crimes might be committed. Such declarations, at best, are the lowest kind of evidence; and the administration of justice will suffer little in any case by their

exclusion; while, if admitted, and they are falsely alleged against a dead witness, it would be hardly possible ever to disprove them." The conclusion is irresistible that the trial court was not in error.

■ The next attack of appellant upon the judgments is based upon the refusal of the court to strike the testimony of the accomplice the "Iron Duke." This witness had testified on his direct examination to the effect that he and an assistant had actually taken the jewels from the women attending the party at the solicitation and instigation of the appellant. At the time he testified he was serving a life sentence in Folsom. On cross-examination he was asked to name and describe the person who aided him in the robbery. He refused to do either. He also refused to say what his own real name was. Counsel then made the motion to strike his entire testimony, calling the attention of the trial court to the authority of *People* v. *McGowan*, 80 Cal. App. 293 [251 Pac. 643], wherein it was determined that the trial court has the authority to strike out the testimony of a witness who declines to answer proper questions on cross-examination on the principle that before testimony is permitted to go to the jury the adversary shall have the opportunity of subjecting it to "such tests as the experience of ages has shown are necessary to render reliance on it safe . . . " We may rely upon the announced principle as correctly stating a rule of evidence. But for reasons now to be stated, we think the court did not commit reversible error. Regardless of whether there was a conspiracy, the evidence sufficiently establishes that the associate of the "Iron Duke" in the actual robbery was a man called Eugene Ferris. The testimony of the appellant discloses that he had met Ferris and could identify his picture by a scar on the face; and that he accompanied the officers to Oxnard for the purpose of finding and identifying the missing participant in the affair. It can hardly be said, therefore, that the failure of the witness to answer the questions was so material or vital as to seriously impair the defendant's right or impel the court to strike the testimony. The similar refusal on the part of the witness to give his own real name cannot be said to have prejudiced the appellant. The witness gave his name when sworn, and on cross-examina-

tion testified to at least five *aliases*. As already observed, he was an inmate of Folsom. It is difficult to imagine how his credibility might have been more seriously attacked, or of what advantage it would have been to appellant to have had the question answered.

■ Appellant also complains because the court permitted the witness W. R. Belknap to state the numbers which had appeared upon the barrel of a revolver and had been scratched off, which pistol the "Iron Duke" testified had been given to him by the appellant, and which according to the evidence had been purchased by the appellant four days previous to the robbery. This witness testified that he had had five years' experience, as special agent for the Pacific Coast Auto Theft Bureau and as inspector with the Motor Vehicle Department in raising numbers obliterated on metal surfaces; that without the aid of his process he could make out on the gun the outlines of the second and the fourth numbers and that they were each 5 and that he could make out portions of other figures; that by applying a secret process the compressed portions of the metal forming the numbers could be made visible; that sometimes the process took hours to react and sometimes only a short time; that he had used his process on this revolver and been able to decipher its number; and that he thought he could again make it visible to the jury. The witness was then asked to apply the process and display the gun to the jury, which he did. Counsel asserts that with the aid of a high-powered miscroscope the jurors could not discern the numerals and that therefore the witness should not have been allowed to state the numbers which he says he was able to raise. We are of the opinion that appellant's argument is addressed to the weight of the evidence rather than to its admissibility. The witness qualified as an expert; the jury had full opportunity through the adroitness of counsel to determine the reliability of the opinion of the witness; and for that reason appellant has no legitimate complaint.

■ We have yet to consider the sufficiency of the evidence as an entirety; the sufficiency of the corroborating testimony; and the claim of appellant that the court admitted hearsay statements, together with the final claim that the trial judge erroneously refused to give requested

instructions. The first two of the problems just stated may be considered together. We have already recited the purport of the testimony of Rosen. The testimony of the "Iron Duke" discloses that after the appellant had failed to interest Rosen in the nefarious enterprise, he approached the witness on April 7, 1927, saying that he knew of three ladies who were desirous of being relieved of their jewelry in order that they might collect the insurance, who would shortly attend a party; that he, the appellant, wished the "Iron Duke" to stage the hold-up, returning to him twenty-five per cent of the proceeds from the sale of the loot, it being agreed that one-fifth thereof was to be paid by appellant to his co-defendant, Ollie Lowe, who was arranging the party; that appellant gave him a list of the jewelry the women were supposed to have with them; that he and the appellant went by the place several times; that appellant took him to the place on the day the robbery was committed, gave him the gun from which he had chiseled off the numbers; that he and his assistant went in and one by one took from the ladies present their jewelry; and that subsequently he and the appellant were making efforts to dispose of their ill-gotten gains when he was arrested.

It was the theory of the prosecution that the appellant, the "Iron Duke" and Ollie Lowe entered into a conspiracy for the purpose of defrauding an insurance company in so far as the jewels belonging to Mrs. Lowe were concerned, and that the representation of the appellant to the "Iron Duke" that the other ladies were willing to have their articles of personal adornment taken, was a misrepresentation. In view of the statement just made, the testimony of Rosen becomes of extreme importance not only as corroborating the testimony of the "Iron Duke," an admitted accomplice, but also as possibly furnishing the foundation necessary to admit the acts and declarations of co-conspirators. This is particularly true when, in addition to what has already been said, attention is directed to the fact that Rosen also testified that Mrs. Lowe accompanied the appellant on one of his trips to persuade the witness to undertake the job; that appellant told him that if the witness did not enter into the conspiracy he would get someone else and that the lady wanted five per cent as her

split. Considering the testimony wholly, for the time being, from the standpoint of its sufficiency to corroborate the "Iron Duke," we must disagree with appellant's contention. When we consider it in connection with the pistol which appellant purchased; found in the possession of "Iron Duke," and identified as to number by the witness Belknap and in conjunction with the testimony of officer "Kynett" that on April 25, 1927, or on the thirteenth day after the crime was committed, he heard the appellant over the dictograph say to his wife that it would be the best move and the best plan to get some certain thing out of town, followed by a conversation regarding the value of certain jewelry; that on the next day he heard the appellant put through a telephone call to a man named Morris to whom the appellant said "Get the stuff so we can get out of town with it and get reservations on a certain train"; that he also heard the appellant call and make reservations; that on the same day he heard appellant say to his wife that "the Duke had called and that the police had 'pert' near got him, and he was unable to meet him there and stated they would have to leave, to be very careful, and leave very quietly in order to get out of town, and that they were going to Glendale to catch the train there; that they would leave on the train that left Glendale at 6:10 and were going to Canada." When these things are considered, as well as the undenied fact that the "Iron Duke" and appellant did board the train at Glendale on April 26th; that a portion of the jewelry was found on the train; and that the evidence establishes beyond question the taking of the jewelry and money from the women named in the information, there can be no doubt that the testimony was sufficient to warrant the jury in returning the verdicts of guilty and that the corroborating testimony tended quite strongly to connect the appellant with the commission of the offenses. It must be confessed that the record as we read it, in print, strongly indicates the possibility that appellant may have been the innocent victim of a designing mind of the underworld. Nevertheless, the record furnishes ample basis for the verdicts of the jury. The degree of credence to be attached to the testimony of convicts is for the jury to determine and the responsibility is theirs.

In the discussion of the sufficiency of the evidence up to this point we have not specifically considered whether the conspiracy was sufficiently proven to warrant the admission in evidence of the statements of co-conspirators. Prefacing our discussion of that subject we here note that the women who are named as the persons the appellant attempted to rob, and one woman that he did rob, were admittedly unexpected by Mrs. Lowe or the appellant. It happened that on the afternoon of the robbery they called Mrs. Cummings and asked if they might come over and see her new home. Another lady whom appellant is alleged to have robbed was induced by Mrs. Lowe to cancel a previous engagement by the statement that she, Mrs. Lowe, had already made the appointment. There is no evidence that Mrs. Cummings had any knowledge of the plan in the mind of appellant and possibly Mrs. Lowe. The allegation is that Mrs. Cummings was robbed. This covers all the counts upon which appellant was convicted. Undoubtedly under the testimony which we have already recited, if a conspiracy existed it would have had its culmination in the sale of the loot and realization by the parties of the following percentages: seventy-five per cent to the "Iron Duke," twenty per cent to appellant and five per cent to Mrs. Lowe. But it would not have been ended here because of the further understanding of the parties and one of the considerations of the illicit concord was that Mrs. Lowe was to recover on the insurance policies by which her jewelry was admittedly protected. (See *People* v. *Rodley*, 131 Cal. 240 [63 Pac. 351].) It cannot be doubted, at least so far as the instant cause is concerned, that there was sufficient testimony of the formation of a conspiracy to go to the jury. Under such circumstances declarations of a conspirator outside the presence of the defendant are admissible, the proper practice being to instruct the jury to disregard the declarations if they do not find a conspiracy (*People* v. *Dixon*, 94 Cal. 255 [29 Pac. 504]). The conspiracy may be proven as any other fact and if a conspirator testifies to what was said and done the evidence is competent for that purpose (*People* v. *Zimmerman*, 3 Cal. App. 84 [84 Pac. 446]), or it may be shown by circumstances sufficient to satisfy the jury of its existence (*People* v. *Schmidt*, 33 Cal. App. 426

[165 Pac. 555]). We have already recited ample testimony to authorize the deduction that there was a conspiracy between the "Iron Duke" and the appellant. We have also noted the presence of Mrs. Lowe on an occasion when appellant attempted to secure the services of Rosen, and that she induced Mrs. Brown to change her engagement because she, Mrs. Lowe, had made an appointment with Mrs. Cummings. We now observe testimony to the effect that it was Mrs. Lowe who took the gin to the party; that when the "Iron Duke" and his companion rang the doorbell, Mrs. Lowe, although in the kitchen mixing drinks, said she would go to the door; that, when the maid pressed the button to open the door she could feel Mrs. Lowe right close to her; that when the two men said they were officers and that a booze party was going on Mrs. Lowe said, "Let them in"; that Mrs. Lowe when given the opportunity to identify the "Iron Duke" and the appellant at police headquarters could not do so and told her friend Mrs. Cummings that she would not identify anyone, although, according to her own admission, the appellant had roomed at her apartment "for a few days" and although she signed his application for a bail bond; that she did very shortly after the robbery file her claim for payment of the insurance. From the testimony we think the trial court was justified in admitting the declarations of either the "Iron Duke," the appellant or Mrs. Lowe under the rule above announced.

We deem it unnecessary to detail the reasons why the failure of the court to give the instructions requested did not constitute an error. We have carefully examined them and have concluded that the court was right in its ruling.

Judgment and order as to count VI reversed, and affirmed as to counts I, II, III, IV and V.

Craig, J., concurred.

Works, P. J., being absent, did not participate in this opinion.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 9, 1929, and a petition by appellant to have the cause heard in the Su-

preme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 22, 1929.

All the Justices concurred.