[Crim. No. 4678. In Bank. Mar. 28, 1946.]

THE PEOPLE, Respondent, v. THOMAS H. COLLUP et al., Appellants.

William C. Ring and Ward Sullivan for Appellants.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

CARTER, J.—Defendants, Miss Flaten and Mr. Collup, were convicted on a three count charge, of assault with intent to commit rape, assault by means of force likely to produce bodily injury, and conspiracy to commit rape. The alleged victim was a Miss Rosenman. She was insane at the time of the alleged commission of the offenses on March 17, 1944.

Miss Rosenman shared an apartment with Miss Flaten and a Miss Curtiss. A Miss Nelson had previously occupied the apartment with Curtiss and Rosenman and was a friend of

theirs. When taken to the hospital the evening of March 17, 1944, Rosenman had a small cut on the back portion of the top of her head, bruises across her throat, on the back of her neck and on her shoulder blades, red marks indicating application of pressure on her lower abdomen and on the inner and outer portions of her right thigh. The examining physician stated that her hymen was ruptured but he could not say whether or not it was of recent occurrence. He found no trauma or blood in the region of the vagina.

Flaten, Curtiss and Nelson had all observed that Rosenman was acting irrational for several days prior to March 17, 1944. Flaten was distraught and worn out from caring for Rosenman and finally the latter's parents residing in an eastern city were contacted. They requested that the care continue until Rosenman's mother had time to come to California. It was decided by the three, Curtiss, Nelson and Flaten, that Rosenman should be placed in a sanitorium and arrangements were made to place her in such an institution on the morning of March 17, 1944, it being understood that the plan could not be accomplished unless Rosenman went voluntarily. The representative of the sanitorium testified that she called at the apartment on the morning of the 17th between 9 and 10 a. m. where she was advised by Flaten that it had been decided not to send Rosenman to the sanitorium, that ''we are going to care for her.'' Flaten testified that the representative did not call until about 12 o'clock noon. Be that as it may, defendant Collup called Flaten on the telephone in the morning apparently intending to make a social engagement with her. He had met her about two months before. Flaten told him about the irrational conduct of Rosenman and the plan of sending her to an institution. Collup, according to his statement, went to the apartment arriving between 10 and 11 a. m. Defendants discussed the condition of Rosenman, Flaten mentioning that Rosenman dwelt on sex in her conversation, sexual affairs with men, and sexual frustration, and reference was made by Flaten to a magazine article discussing shock as a treatment for mental ailments. Collup removed his coat and entered Rosenman's bedroom. She was sitting on the footboard of the bed swaying back and forth and pulling her hair over her face. She was fully dressed. Collup removed her from the footboard and sat on her bed where he held her on his lap brushing the hair from her face and attempting to sooth her. Defendants left Rosenman in

her room and retired to the kitchen where several drinks of alcoholic content were consumed. According to their testimony Rosenman entered the kitchen attired in nothing but a T shirt and under pants. There was a spot of blood on the front of the shirt. Her nose was bleeding slightly. It was wiped by one of the defendants. She had her eyes closed and had nothing to say. She was swaying back and forth. Collup grasped her by the shoulders and shook her and slapped her face attempting, as defendants claim, to "snap" her out of the condition. He took her back to bed in her room. Defendants consumed three "shots" of whiskey and 1½ quarts of rum during the day, and at various times removed Rosenman from her seat on the foot of the bed and put her to bed. During the afternoon defendants retired to Flaten's bedroom where Collup stripped and they indulged in an act of sexual intercourse. According to Collup, he thereafter found Rosenman on the footboard of the bed. He was attired in his shorts. Rosenman was nude. He laid her down on the bed. The events of the day were somewhat hazy in the minds of both defendants. Curtiss testified that she telephoned about 10 a. m. and Flaten told her the sanitorium representative had not yet arrived. She called again at 1 o'clock but although the receiver was lifted, no one answered. Flaten telephoned Curtiss at 5:30 p. m. According to Curtiss, Flaten told her not to come home for she was experimenting with Rosenman and had a doctor there. At Curtiss' request Collup was called to the telephone and said he was a doctor and Curtiss could come home. Flaten admitted the conversation with Curtiss except that she merely asked Curtiss not to come home. Her reason for the request, she stated, was because of the drinking by her and Collup, and she thought it wise to advise him to say he was a doctor. Collup stated he merely told Curtiss she could come home.

Curtiss arrived at the apartment at about 6 p. m. and had a conversation with Flaten in the dinette. She testified that there was blood on towels on a pile of clothes in the kitchen. She stated that Flaten told her Rosenman would be normal after the treatment she had received, that she had brought a man to the apartment (Collup) who had been beating her all day, that Rosenman needed a man—sexual intercourse, and that she had had such with Collup and that she enjoyed it and wanted more. Collup walked out of Rosenman's room covered with blood, being clad in a robe, but his legs were

bare to above the knees. She said Collup told her he had beaten Rosenman and that Flaten had to get him drunk to do it. After that. he returned to Rosenman's room and closed the door. She and Nelson summoned the police, and after they arrived, Collup was running around the apartment nude. She saw Rosenman in her bedroom. She had bruises and blood between her legs. When Collup came out of Rosenman's room the second time he was nude and attempted to choke Flaten who was endeavoring to get him to leave.

Nelson testified that she had discussed Rosenman's mental condition with Flaten and suggested a rest home with which Flaten agreed. She saw Rosenman on the evening before the alleged offenses and she had no bruises or cuts on her body. She came to the apartment on the 17th shortly after Curtiss arrived pursuant to the latter's telephone call. There were two blood stained slips on a pile of clothes in the kitchen. Flaten was not in the apartment at the time. After talking to Curtiss, she opened the door to Rosenman's room and saw Rosenman on the bed naked in a "praying position" and eyes shut. Collup, also nude, was standing at the foot of the bed. She immediately shut the door. She also saw in the bedroom a bloody sheet, the absence of any covers on the bed and blood running down Rosenman's face. The living room was in an "uproar" and the blinds drawn. She told Collup to get dressed and get out and he replied that he was Rosenman's husband and he did not have to leave. He cursed, remarking that there was nothing but bastards and sons-of-bitches around. Flaten in her endeavor to make Collup leave was choked by him. She saw Rosenman, still nude, kneeling on the floor. She had bruises between her legs and blood on her "private parts." When she first arrived at the apartment Flaten was outside with her mother. Flaten told her not to go in and stated: "I [Flaten] called a friend of mine [Collup] this morning, and they told me that when a person is insane and they go to these hospitals, these rest homes, these private rest homes, they put them in a bed and they mark a big X and then they just leave them and they don't get any care. . . . So she said 'I called a friend of mine, and he sent some friend over that knows all about these things, he has been in one of these institutions and he knows.' I said, 'Did the nurse come?' She said, 'No, the nurse didn't come,' she said, 'The doctor was not going to be there today,' and she said, 'Marge, I think all Natalie needs is a good lay, so'

she said, 'I brought a man over and he has been beating her all day,' she said, 'You should see the apartment, it's full of blood, he has been hitting her and everything all day in there,' and I said, 'I am going in the house Lillianne,' and she stayed out in front and I went in the house.''

The prosecution produced evidence of extrajudicial admissions by Flaten in which, among other things, she said that she had had a long talk with Collup at the apartment on March 17, 1944, about Rosenman's mental condition and that they agreed that an act of sexual intercourse would help her, and that she took Collup to Rosenman's room and left him there for about 45 minutes to permit him to consummate the act.

Without further recitation of the evidence we believe that a case was presented which would have justified the jury in finding the defendants not guilty of the charges against them. Heavy reliance for a conviction necessarily rests upon the extrajudicial statements of Flaten and the testimony of Nelson as to statements by said defendant and her observations at the apartment on the evening of March 17, 1944. Under these circumstances error with regard to the admission of evidence to impeach the testimony of Nelson is of vital importance even though many of the circumstances were brought out from other witnesses.

At the trial the prosecution was permitted to read, over defendants' objection, that there was insufficient showing of unavailability and diligence in procuring her attendance, from a transcript of the testimony given by Nelson at the preliminary examination of defendants, upon the statement by the prosecution that "this deputy has received a letter from Marjorie Nelson, at which time she advised me that she has since the date of the preliminary remarried and her name is Coscorelli. She is in Caliente, Nevada, in the Lincoln County Hospital as a registered nurse and regularly employed there. I have had several communications from her, the last of them being under the date—postmarked August 7th, Caliente, Nevada. And on each of her communications she has indicated that she was permanently employed there. She was served with a subpoena before leaving California, and she wrote and asked me to be excused. I told her we would expect her here, but we have no way of enforcing the subpoena. On that showing the People will ask leave to read the testimony of Miss Nelson. . . . THE COURT: Will you

stipulate the facts as related by Mr. Wildey [deputy district attorney] that if Mr. Wildey were sworn he would testify to the same facts? MR. BERNAY: I will stipulate to that.'' On defendants' case, defendant Flaten, over the objection of the prosecution, testified concerning a conversation between her, and her mother and Nelson occurring *after* Nelson had testified at the preliminary hearing. In connection therewith the following occurred. ''Q. What was said about the testimony in this case, Miss Flaten, so far as you and Miss Nelson had testified to in court? . . . A. The statement that Miss Nelson made to me in the presence of my mother and myself concerning me was the fact that she was sorry for anything she had said or done in order to hurt me, and she had no intention of hurting me, that she made no charge against me, and that when they took her story previously they hadn't got it straight. . . . Q. Now, what, if anything, did Miss Nelson in that conversation say to you regarding the truth or falsity of any case that she may have testified to in court at the preliminary haring? . . . Q. Right then and there about her own testimony? A. That is right, that they hadn't gotten this story straight, and that she had said so many things that were prompted by Miss Curtiss that were untrue, she was very sorry, that she was making no charges against me.'' Mrs. Thomas, Flaten's mother, testified in regard to the same conversation. The following occurred: ''Q. At the time something was said by Miss Nelson with reference to her testimony at the preliminary hearing in this case, were you there at that time? A. I was. Q. Please tell the Court and jury to the best of your recollection as to what Miss Nelson said about her testimony at the preliminary hearing? . . . A. She said that 'I am very very sorry about some statements I made at the preliminary hearing. I sure thought I could detract some of them, but Miss Curtiss and I talked it over before the preliminary hearing, and she had put the words in my mouth, the different things to say.' . . . Q. Was that why you didn't ask her what some of the things were that she testified to? A. I really don't know why, we didn't discuss the things at all, only things in general; she said that there were some things that she had told on the stand that were untrue.'' After the defense rested, the motion of the prosecution to strike all of the foregoing testimony of Flaten and Thomas impeaching Nelson was granted and the jury instructed to disregard it, on the ground that it was

impeachment by contradictory statements and no foundation or predicate had been laid by asking the witness to be impeached whether or not she had made such a statement, giving the time, place and persons present. ▆ It is undoubtedly the general rule that: "A witness may also be impeached by evidence that he had made, at other times, statements inconsistent, with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them." (Code Civ. Proc., § 2052.) However, we do not believe that the foundation requirement is necessary where it is impossible to comply with it due to no fault of the party urging the impeachment. ▆ In the instant case the prosecution was enabled to read the transcript of Nelson's testimony given at the preliminary hearing on the basis of a showing (the sufficiency of which we do not decide) that the witness was out of the state. (Pen. Code, § 686; Code Civ. Proc., § 1870(8).) The witness was not therefore available to either the prosecution or defendants. The impeaching evidence consisted of statements made by the witness *after* she had testified at the preliminary hearing and hence could not have been used at the preliminary hearing. The defendants are helpless in meeting the testimony by a method which may refute it entirely or cast serious doubts upon its veracity, namely, subsequent contradictory statements or admissions by the witness that the testimony was false. Justice and fairness compel one of two results, that the testimony at the former trial be excluded or that the impeaching evidence be admitted. The reading of the former testimony is expressly permitted by the code (Pen. Code, § 686; Code Civ. Proc., § 1870(8)), and the goal of all judicial proceedings is to bring before the trier of fact all pertinent evidence. Hence the rule allowing the use of former testimony is a salutary expedient in the administration of justice. But it is equally clear that by reason of the same principle the impeaching evidence should be admitted for what it is worth. It is also evidence which throws additional light upon the case. ▆ The reason for the requirement that a foundation be laid is in furtherance of that policy. To prevent the surprise of the party offering the witness, that is, to give him data from which his witness may refute or explain the impeachment, and to present the complete picture of the credibility

of the witness by preserving the opportunity to explain or refute, and the danger of false testimony by the impeacher are valid reasons for the rule. With reference to surprise, the prosecution should bear that burden when they take advantage of the unavailability of the witness as a basis for introducing the testimony at a former hearing. Insofar as the reasons for the rule consist of the endeavor to get all of the pertinent evidence before the court and to further test the credibility of the impeachment, the lack of the foundation cannot be said to impair the value of the impeaching testimony to the point where it should be rejected when it is impossible to lay the foundation.

Closely analogous to the question here presented, is the rule declaring admissible, contradictory statements to impeach dying declarations. The only difference of consequence is that the offeror of the impeaching evidence had no opportunity to cross-examine the declarant. There is, however, the right of cross-examining the witness to the declaration, and like in the case at bar, the declarant-witness is unavailable, making the laying of a foundation impossible. The same principles should be applicable in both cases. ■ Dying declarations may be impeached by contradictory statements of the deceased without laying a foundation. (*People* v. *Amaya,* 134 Cal. 531 [66 P. 794] ; *People* v. *Lawrence,* 21 Cal. 368; *People* v. *Attema,* 75 Cal.App. 642 [243 P. 461] ; *Carver* v. *United States,* 164 U.S. 694 [17 S.Ct. 228, 41 L.Ed. 602] ; 16 A.L.R. 419; III Wigmore on Evidence (3d ed.), § 1033.) It has been held that there is a distinction between impeaching dying declarations and testimony at a former trial because of the opportunity to cross-examine in the latter case (*Mattox* v. *United States,* 156 U.S. 237 [15 S.Ct. 337, 39 L.Ed. 409]), but as we have seen the issue is largely one of the value of the evidence, and that factor should not be decisive. The Mattox case was by a divided court, and Justice Shiras, dissenting, in discussing the question, stated: ''Undoubtedly, the credit of witnesses testifying under oath should not be assailed by evidence of their statements made elsewhere, without affording them, if practicable, in justice to them and to the party calling them, an opportunity to deny, explain, or admit; but it must not be overlooked that the primary object of the trial is not to vindicate the truth or consistency of witnesses, but to determine the guilt or innocence of the accused. If the evidence tending to show that the testimony of an essential wit-

ness cannot be relied on, because he has made contradictory statements elsewhere and at other times, is valid and admissible, as the authorities all concede, why should the right to put in such evidence be destroyed by the incidental fact that the witness, by reason of death, cannot be produced to deny or to admit that he made such statements? Does not the necessity call for a relaxation of the rule in such a case?'' In *Carver* v. *United States, supra,* the court permitted the impeachment in the case of dying declarations and cited the Mattox case, but stated, at page 698: ''We are not inclined to *extend* it to the case of a dying declaration. . . .'' The opportunity to cross-examine is not of too great significance when we have a case where the contradictory statements were made after the former testimony or were not known to the impeacher at the time. In such case he never had an opportunity for cross-examination to test the witnesses' reliability on that ground.

The modern tendency is to relax rigid rules of evidence—to escape from a slavish adherence to them with the accompanying hardship, injustice and prevention of a full disclosure of all pertinent circumstances to the trier of fact. Dean Hale, of the School of Law of the University of Southern California, aptly states: ''However, it doubtless is possible to follow this rule, calling for foundation, too slavishly. Cases arise in which the laying of the foundation is impossible or impracticable—for example, where a deposition is taken and the conflicting statements are made thereafter, or where the declarant of admissible hearsay has told conflicting stories.'' (10 So.Cal.L.Rev. 136.) We conclude therefore that no predicate was necessary for the impeaching evidence in the instant case.

The cases of *People* v. *Witty,* 138 Cal. 576 [72 P. 177]; *People* v. *Compton,* 132 Cal. 484 [64 P. 849]; *People* v. *Greenwell,* 20 Cal.App.2d 266 [66 P.2d 674]; *People* v. *Seitz,* 100 Cal.App. 113 [279 P. 1070]; *People* v. *Garnett,* 9 Cal.App. 194 [98 P. 247]; *People* v. *Pembroke,* 6 Cal.App. 588 [92 P. 668], seem to hold contrary to the views herein expressed. The Compton and Witty cases were decided in department and no hearing in bank was requested. The judgment of conviction of defendant in the Compton case was reversed on the ground that the jury was not properly selected. The court then volunteered the holding that the defendant could not impeach by contradictory statements the testimony of a

prosecution witness read from the transcript thereof at the preliminary hearing. There is no discussion, the court merely remarking, at page 486: ''We know of no rule of law justifying the impeachment of the witness under these circumstances.'' The Witty, Greenwell, Garnett and Pembroke cases merely cite the Compton case or other cases without discussion. None of the cases cite or discuss *People* v. *Lawrence,* *supra.* Insofar as those cases hold that the testimony of a witness given at a former trial, and read at the instant trial, because of the nonavailability of the witness cannot be impeached by contradictory statements made subsequent to the former trial, or by statements made prior thereto but where the impeacher clearly shows that he had no knowledge of such contradictory statements, they are, and each of them is, overruled.

The judgments and order denying a new trial are reversed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

SPENCE, J.—I dissent.

It would serve no useful purpose to review further the sordid details of the testimony relating to appellants' drunken debauch and the brutal treatment inflicted upon the deranged victim. Disregarding entirely the testimony of Miss Nelson, there was abundant evidence which pointed unerringly to the guilt of appellants on all counts. I am therefore of the opinion that the error, if any, in striking the evidence tending to impeach the testimony of Miss Nelson was not prejudicial and that it cannot be said to have resulted in a miscarriage of justice. (Const., art. VI, § 4½.)

Shenk, J., and Edmonds, J., concurred.