[Crim. No. 7370. Third Dist. Jan. 16, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN RAY COLLINS, Defendant and Appellant.

**COUNSEL**

John Page Cerny, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, and Edmund D. McMurray, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**FRIEDMAN, Acting P. J.**—Defendant appeals after a jury trial resulted in his conviction of robbing the Bank of America on May 25, 1973, and robbing the Crocker Bank on June 15, 1973. In connection with the latter offense the jury found that defendant had intentionally inflicted great bodily injury (Pen. Code, § 213) and had used a firearm (Pen. Code, § 12022.5). Although confederates participated in both holdups, defendant was tried alone.

I

At the outset we consider defendant's objection to the "great bodily injury" finding. Penal Code section 211a elevates robbery from the second to the first degree when it is committed by a person armed with a deadly or dangerous weapon. Section 213 imposes a sentence of five years to life for first degree robbery but augments the minimum term to fifteen years when the robber intentionally inflicts great bodily harm on the victim.[1]

According to witnesses, the Crocker Bank holdup was committed by four men. All were black; all were wearing ski masks; all were armed, one with a sawed-off shotgun, the other with pistols. During the holdup the robbers pistol-whipped several bank employees, struck others with the butt of the shotgun and fired several shots in the bank manager's direction. As they left the bank, one robber shot and wounded a bank employee who was lying on the floor after being pistol-whipped.

At defendant's trial, the court instructed the jury in effect that a robber may inflict great bodily injury if he aids and abets it even though he does not personally inflict the injury.[2] Defendant assigns this instruction as

---

[1]Penal Code section 213 provides: "Robbery is punishable by imprisonment in the state prison as follows:

"1. Robbery in the first degree for not less than five years.

"2. Robbery in the second degree, for not less than one year.

"The preceding provisions of this section notwithstanding, in any case in which defendant committed robbery, and in the course of commission of the robbery, with the intent to inflict such injury, inflicted great bodily injury on the victim of the robbery, such fact shall be charged in the indictment or information and if found to be true by the jury, upon a jury trial, or if found to be true by the court, upon a court trial or if admitted by the defendant, defendant shall suffer confinement in the state prison from 15 years to life."

[2]The jury instruction declared: "A defendant who, in the commission of a robbery, knowingly and with specific intent to inflict great bodily injury either aids and abets in, or advices [sic] and encourages the infliction of great bodily injury by a co-perpetrator

error. He also charges insufficiency of the evidence to sustain the jury's finding of great bodily injury. Both claims are grounded on the thesis that the augmented punishment for great bodily injury is directed only at a robber who personally inflicts the injury, not at his accomplice in the robbery.

The 1967 Legislature amended the robbery, burglary and rape statutes to increase minimum sentences when the offender intentionally inflicts great bodily injury on the victim. (Stats. 1967, chs. 149, 150, 151.) These amendments were prompted by the belief, however debatable, that the augmented penalties would possess augmented deterrent force. (*People v. Carroll*, 1 Cal.3d 581, 584 [83 Cal.Rptr. 176, 463 P.2d 400].) The problem at hand, application of the augmented penalty clause in a multi-offender robbery, has not been judicially settled.[3]

Defendant poses an analogy, Penal Code section 12022.5, which imposes an augmented penalty when an offender "uses" a firearm. He cites *People v. Lee*, 275 Cal.App.2d 827, 833-834 [80 Cal.Rptr. 491], for the proposition that section 12022.5 does not apply to an unarmed defendant whose confederate was armed. The *Lee* case does appear to support the proposition, if only by inference. Nevertheless, it is only an analogy. ■ The scope of an augmented penalty statute is determined by construing the particular statute to effectuate the discerned legislative objective. (See *People v. Floyd*, 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862]; *In re Shull*, 23 Cal.2d 745 [146 P.2d 417].)

The bodily injury clause of section 213 is formulated in terms of a single offender and a single victim. (See fn. 1, *ante.*) It refers to "the defendant" who in the course of a robbery intentionally inflicts injury "on the victim." Like most other criminal statutes, it is not framed in terms of multi-party offenses. Such statutes operate in harness with other, more general, provisions of the Penal Code. One is Penal Code section 7, which declares that code language in "the singular number includes the plural, and the plural the singular." Another is Penal Code section 31, which makes an aider and abetter liable as a principal in the

---

upon a victim, is equally responsible under the law with his co-perpetrator for the infliction of great bodily injury even though the defendant did not himself directly and actively inflict such injury.

"A person aids and abets in the infliction of great bodily injury if he knowingly and, with specific intent required, aids, promotes, encourages or instigates by act or advice or, by act and advice, the infliction of such injury."

[3]The problem was described but not resolved in *People v. Richardson*, 23 Cal.App.3d 403, 409 [100 Cal.Rptr. 251].

crime. Thus, the absence of language indicative of collective responsibility for great bodily injury is no barrier to its imposition if collective responsibility is indeed a statutory aim.

■ The robbery statutes establish a three-level hierarchy of punishments. (Cf. *People* v. *Wells,* 14 Cal.App.3d 348, 357 [92 Cal.Rptr. 191].) The lowest, a sentence of one year to life, is imposed for second degree robbery; the second, five years to life, for first degree robbery (generally, armed robbery); the third, fifteen years to life, for robbery with great bodily injury. (Pen. Code, §§ 211a, 213.) At the second level, an unarmed participant may be convicted of armed robbery if his confederate alone is armed. (*People* v. *Perkins,* 37 Cal.2d 62, 64 [230 P.2d 353]; *People* v. *Lee, supra,* 275 Cal.App.2d at p. 832.) The theory is that the unarmed participant is guilty of the more heinous offense because he aided and abetted it; thus, section 31 makes him a principal in its commission. (*People* v. *Perkins, supra,* 37 Cal.2d at p. 64.) It is quite logical to expect an equivalent effect at the third level, that is, a robbery participant who did not personally inflict great bodily injury may be liable for the augmented penalty as an aider and abetter in the injury.

■ An important factor is the provision restricting the augmented penalty to one who inflicted great bodily injury "with the intent to inflict such injury." Specific intent to commit the injury is thus an essential ingredient. (*People* v. *Richardson, supra,* 23 Cal.App.3d at p. 410.) The demand for specific intent as an essential element of a crime does not preclude liability of an aider and abetter, because the latter becomes liable only when he shares the criminal intent of his confederate. (*People* v. *Butts,* 236 Cal.App.2d 817, 836 [46 Cal.Rptr. 362].) A palpable distinction emerges at this point—a distinction between complicity in the robbery alone and complicity which covers both robbery and great bodily injury. The distinction would bar the augmented penalty where the defendant planned or aided the robbery but did not participate in planning or execution of bodily injuries inflicted after the robbery got under way. When several robbers enter a place and embark on a general program of robbery and assault, all are susceptible to circumstantial proof of a common design to inflict physical hurt on the victims. Thus the legislative demand for specific intent does not imply a legislative purpose to exclude an aider and abetter from the augmented penalty.

Every provision of the Penal Code is to be construed to effect its object. (Pen. Code, § 4.) Thus the Legislature does not intend a statute which may be easily frustrated or evaded. Facial masking of participants

is a prominent and frequent characteristic of robbery. The current skiing vogue has created a vogue for ski-masked holdup men. Direct identification of masked robbers is frequently impossible. The victims of a masked holdup gang may be expected to describe the individual events, but hardly to tie any one of the masked robbers to any particular event. Seldom will a victim be able to identify which of several masked robbers inflicted physical injury. A rigid statutory demand for proof of personal assaultive action would permit each defendant to use the other as a foil. The augmented penalty would be frustrated by impossibility of proof. █ Construed to achieve its objective, the great bodily injury clause of section 213 imposes liability on a robber who aids and abets in the injury of a victim even though he does not personally inflict the injury.

█ The trial court's jury instruction (fn. 2, *ante*) fully satisfied section 213 as so construed. It did not invite a finding of augmented culpability against one who was an accomplice only in the robbery. In cogent and incisive fashion it confined liability to one who possessed specific intent as an aider and abetter in the injury itself. It correctly described the essential concept of the augmented penalty clause.

█ However circumstantial, the evidence identified Collins, the present defendant, as one of the four armed masked men who entered the bank to rob and to engage in an indiscriminate program of beatings and shootings. The verdict finding him guilty of intentionally inflicting great bodily injury is supported by substantial evidence.

## II

At this point we have completed the only portion of this opinion which meets the criteria for publication in the official reports fixed by rule 976, subdivision (b), California Rules of Court.[4] Although important to the prosecution and the defendant, the remainder of this opinion has no precedential value. Unfortunately, the Rules of Court do not provide for partial publication of appellate opinions. To swell the torrent of published reports by judicial lucubrations adding nothing to the law is regrettable but unavoidable.

[4]Rule 976, subdivision (b), provides: "No opinion of a Court of Appeal or of an appellate department of the superior court shall be published in the Official Reports unless such opinion (1) establishes a new rule of law or alters or modifies an existing rule, (2) involves a legal issue of continuing public interest, or (3) criticizes existing law."

## III

We reject defendant's claim of insufficient evidence to sustain his conviction of the Bank of America robbery. ■ A verdict will not be set aside for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there substantial evidence to support it; the reviewing court views the evidence in the light most favorable to the prosecution and presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Kunkin*, 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392]; *People v. Redmond*, 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

■ One who transports a robber to the scene for the purpose of assisting him to commit the offense is guilty as an aider and abetter. (*People v. Armendariz*, 141 Cal.App.2d 608, 610-612 [297 P.2d 79].) The prosecution evidence sufficiently showed that defendant had transported Donald Calhoun to the Bank of America for the purpose of aiding the latter in the robbery. A witness testified that he saw a Toronado Oldsmobile drive past the bank three times before it stopped and let off Calhoun. The Toronado was later identified as defendant's. Calhoun took the stand. He admitted that he had held up the bank teller and that he had been armed with a .25 caliber automatic. The demand note he handed the teller bore Calhoun's fingerprints and defendant's palm print. From this evidence the jury could reasonably infer that defendant and Calhoun had jointly planned the robbery; that both had worked on the demand note; that defendant and Calhoun had scrutinized the area of the robbery by driving past the bank several times; that defendant's activities were designed to assist Calhoun's crime.

Calhoun testified that he had walked to the bank and denied that defendant had driven him. The defense interposed several alibi witnesses, who testified that defendant's Toronado had been inoperable on the day of the robbery. The jury were entitled to disbelieve the evidence favoring the defense.

Defendant charges lack of evidence that Calhoun was armed. He refers only to the bank teller's testimony that she had seen a shiny object at defendant's waist. At this point defendant overlooks Calhoun's admission that he had been carrying a .25 caliber pistol when he robbed the bank.

Defendant presented alibi evidence relative to both robberies. He

objects that the alibi instruction given by the court (CALJIC No. 4.50) was phrased only in the singular, i.e., it referred only to "the alleged offense" for which defendant was on trial. He argues that after three weeks of trial and 40 witnesses, many of them dealing only with the Crocker Bank robbery, the jurors could have forgotten the alibi evidence relative to the Bank of America robbery. The argument rests on speculation and is inacceptable. The phraseology of the alibi instruction had no tendency to bar it from consideration in relation to either offense.

## IV

Defendant charges lack of evidentiary support for the guilt verdict in the Crocker Bank holdup. Three men were implicated with defendant in that holdup: Raymond Henderson and two brothers, Floyd and Donald Calhoun. At least four persons held up the bank at about 10:15 a.m., June 15. All were black; all were armed and masked. After taking almost $3,800, the robbers drove away in a black Ford automobile.

Motorcycle Patrolman Downing pursued them to the rear of the Florin Woods apartments, where they scrambled out and ran into the apartment complex. Donna Vincent was at the rear of the apartment complex and also saw the persons leave the car. All were shabbily dressed. Downing searched the area and after five or six minutes saw defendant walking across a courtyard. Downing questioned him. Mrs. Vincent approached and told Downing that she did not think the defendant was one of the men, because defendant was neatly dressed.

At Downing's request, defendant identified himself. Mrs. Welsh, the apartment manager, told the police that an occupant of apartment 74 had recently been released from prison. (The apartment in question was rented to Raymond Henderson.) Later Mrs. Vincent and Mrs. Welsh were twice approached by defendant, who questioned them as to their knowledge of the robbery; defendant insisted on getting Mrs. Vincent's name. Later defendant was seen listening to a telephone conversation as he stood with his ear against the apartment manager's door.

Defendant was next seen in front of the apartment complex by an FBI agent, who began questioning him. Inspector Dyer of the sheriff's office approached and asked defendant if he had come from apartment 74. Defendant answered in the affirmative and was arrested for robbery. In addition to defendant, the police also arrested Raymond Henderson, whom they found hiding in apartment 74; Floyd Calhoun, who was

hiding in a garage near the apartment complex; Donald Calhoun, who was found in a patio area in the apartment building.

The Crocker Bank robbery occurred at about 10:15 a.m. on June 15. Read into the record at defendant's trial was the preliminary examination testimony of Agnes Porter. She lived across the street from the Calhoun brothers. She testified that about 9 a.m. on June 15 defendant and Raymond Henderson drove up in defendant's lavender Toronado automobile to the Calhoun residence. Henderson carried into the house a long, thin object, about two and one-half feet long, covered with a coat. A few minutes later he returned without the object and entered defendant's car. He and defendant drove off. About five or ten minutes later Floyd and Donald Calhoun left the apartment and drove off in the black Ford later identified as the getaway car.

The prosecution called Anthony Thomas, a resident at the Florin Woods apartments, who testified that he had never told anyone previously that he had seen defendant's Toronado automobile and the black Ford drive into the apartment parking area on June 15. Thomas also did not recall telling anyone that while the black Ford was being chased, the Toronado was still parked in the same place at the Florin Woods apartments. Donna Vincent then testified that Thomas had told her that he had seen both automobiles together in the early morning of June 15. Mr. Carter, a sheriff's detective, testified that Thomas told him of seeing defendant's Toronado in the parking lot of the Florin Woods apartments on June 14 and had also seen the Toronado the morning of June 15 parked on the street near apartment 74.

Cecil Rowe, another resident of the Florin Woods apartments, stated he had seen a person enter apartment 74 at around 9 a.m. on June 15 but denied he had ever told anyone it was defendant Collins. Two witnesses, Louise Nicolson and Vicki Welch, testified that Rowe had told them he had seen defendant enter apartment 74 that morning.

Donald Calhoun testified that neither he nor defendant Collins had robbed the Crocker Bank and that he, Calhoun, had never told anyone otherwise. Inspector Dyer then testified that he had interviewed Donald Calhoun at the Vacaville prison; that Calhoun had told him that Collins had driven his three companions to the Crocker Bank on June 15 and all four had entered the bank to rob it. Detective Kelley testified that he had talked to Donald Calhoun on June 15 after the capture of the four suspects; that Calhoun had told him that he and his brother Floyd were

at their residence and were picked up by Steve Collins (defendant) and a person known as Ray Dick (later identified as Raymond Henderson); that Henderson indicated they were going to rob a bank; that he himself remained outside the bank in the car, while the other three (all being armed) went into the bank; that after the other three returned to the car, Collins drove them from the scene; that he himself had not participated in planning the robbery, but his brother Floyd, Henderson and Collins had been planning the robbery for over a week; that only four persons were involved.

In evaluating the prosecution evidence, we bear in mind that the prior inconsistent statements of Anthony Thomas (as related by Donna Vincent and Detective Carter) and of Donald Calhoun (as related by Inspector Dyer and Detective Kelley) were admissible as substantive evidence of the facts detailed in these statements. (Evid. Code, § 1235; *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) Although defendant labels these extrajudicial statements as hearsay, the makers of these extrajudicial statements were all present in court and available for cross-examination concerning their current and prior statements. (*People* v. *Williams,* 9 Cal.3d 24, 38 [106 Cal.Rptr. 622, 506 P.2d 998].)

The extrajudicial statement of Donald Calhoun supplied direct evidence of defendant's participation in the Crocker Bank holdup. It was supported and corroborated by circumstantial evidence, i.e., that defendant and Henderson had gone to the home of the Calhouns in defendant's Toronado automobile; that they had then driven the Toronado to Henderson's apartment at Florin Woods, followed by the Calhoun brothers in the black Ford; that the Toronado had been left parked at the apartment while the four men drove off in the black Ford. The latter vehicle, in turn, was identified as the getaway car used in the robbery. In combination, the direct and circumstantial evidence fully supported the finding of defendant's guilt as an active participant in the Crocker Bank holdup.

V

Agnes Porter's preliminary examination testimony was read into the record after the prosecution had established its diligent but unsuccessful effort to produce her at the trial. As we have observed, Mrs. Porter had described the goings and comings of defendant, Ray Henderson and the two Calhouns on the morning of the Crocker Bank robbery. Defendant

attempted to impeach her through the testimony of Detective McClain. Outside the jury's presence, McClain testified that on June 15 a woman had telephoned him, had identified herself as Agnes Porter and implicated the Calhouns in the Crocker Bank robbery without naming either Henderson or defendant. McClain said that he had talked with the woman only on the one occasion; that he would not recognize the voice again if he heard it; that he had not recognized the voice as being that of a person with whom he had previously conversed; that he had never seen the woman who phoned him. The prosecution objected to the admission of McClain's statement on the grounds of hearsay and lack of authentication. The trial court sustained the objection, a ruling which defendant now assigns as error.

 Generally, a hearsay declarant may be impeached by hearsay declarations. (*People* v. *Collup,* 27 Cal.2d 829, 836-837 [167 P.2d 714].) Thus the hearsay ground of objection failed. The authentication, however, was extremely thin. The identity of McClain's caller was a preliminary fact which defendant had the burden of establishing. (Evid. Code, § 403, subd. (a)(4).) If the evidence was sufficient to sustain a finding either way, the question was for the jury; the judge, however, had the sole function of deciding whether there was sufficient evidence of the caller's identity to submit the question to the jury. (*LeGrand* v. *Yellow Cab Co.,* 8 Cal.App.3d 125, 133 [87 Cal.Rptr. 292]; Witkin, Cal. Evidence, § 1088.) There was no error in excluding the proferred impeachment.

 On each of the two robbery convictions the trial court sentenced defendant to prison for the term prescribed by law. On appeal defendant seeks a specific order declaring the concurrency of the two sentences. There is no need for an express declaration. When a court convicts a person of several crimes without determining how the sentences shall run in relation to one another, they run concurrently. (Pen. Code, § 669.)

The judgments are affirmed.

Regan, J., and Janes, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 2, 1975.