[S. F. No. 6450.   Department Two.—November 20, 1913.]

In the Matter of the Estate of CHARLES J. MARTIN, Deceased.

ESTATE OF DECEDENT—LETTERS OF ADMINISTRATION—EFFECT OF INTERLOCUTORY DECREE OF DIVORCE.—The existence of an interlocutory decree of divorce does not take away the right of the widow to administer the estate of her husband.

ID.—SEPARATION AGREEMENT BY HUSBAND AND WIFE—WAIVER BY RESUMPTION OF MARITAL RELATIONS.—A contract between husband and wife which settles their property rights and contains her waiver of all claim of interest in his estate and all rights therein after his death, bars her right to administer his estate, although after the execution of the agreement he visits her, furnishes her money, writes her endearing letters, has sexual intercourse with her, but does not live with her. Such conduct does not amount to a resumption of marital relations annulling the precedent contract.

APPEAL from an order of the Superior Court of Santa Clara County on applications for letters of administration. P. F. Gosbey, Judge.

The facts are stated in the opinion of the court.

Will M. Beggs, and R. C. McComish, for Appellant.

Louis Oneal, and William F. James, for Respondent.

MELVIN, J.—Cora H. Martin, the widow of Charles J. Martin, and Hipolite J. Martin, his son, each filed a petition for letters of administration upon the estate of said Charles J. Martin, deceased. The court, pursuant to stipulation, heard both petitions together and made an order granting the prayer of Hipolite J. Martin and another denying the application of the widow. From these orders she appeals.

Under ordinary conditions and unless she waives that right in some way, the widow is entitled to letters of administration. In this case it appeared that on August 29, 1911, Charles J. Martin and Cora H. Martin entered into an agreement settling certain property rights and containing a waiver by her of all claim of interest in his estate and all rights therein after his death. Later Charles J. Martin sued her for divorce and on September 23, 1911, an interlocutory decree in his favor was entered. Martin died in April, 1912. The lower court reached the conclusion that the agreement was sufficient, if in force, to cut off the rights of Cora H. Martin to administer, and that in fact it was in full effect at the time of the death of Charles J. Martin.

It is only necessary to examine the contract and to consider the conduct of the spouses after its execution in determining whether or not it was still in force when Martin died. The existence of the interlocutory decree would not take away the right of the widow to administer. (*Estate of Dargie*, 162 Cal. 52, [121 Pac. 320].) And appellant contends that her uncontradicted testimony establishes a reconciliation between herself and her husband together with conduct which amounted to such resumption of marital relations as, under the authorities, amounts to an annulment of the contract whereby she agreed to forbear all claim of interest in her husband's estate. It is not necessary to repeat the language of the contract. That instrument contains a complete waiver by each party of all rights of any kind in the other's estate. Let us then examine Cora H. Martin's testimony regarding her

relations with her husband after the entry of the interlocutory decree. She swore that very soon after the trial she met her husband in a candy store in San Jose. She was weeping and he, calling her names of endearment, begged her not to cry. He asked permission to call upon her and did call many times. According to her testimony, Mr. Martin declared his intention of returning to live with her when he should get back his property which had passed into the control of his children. She told of sexual relations between her and her husband occurring at frequent intervals between the time of the entry of the interlocutory decree and his final illness. A number of letters written by Mr. Martin to his wife during the early part of the year 1912 were introduced in evidence. These were couched in affectionate terms. She was addressed as "Dear Corita" and he signed "Your loving husband" or "Yours lovingly." In some of them there are expressions which might indicate a wish on his part for a reconciliation. They also contain admonitions to her to control her temper and in one is the statement that he and she had not understood each other. Not one of them contains a request for the resumption of marital relations. Indeed, in one he writes, "If you think your comfort and happiness will serve you better by remaining south, why do so." Mr. Martin, according to appellant's statement, furnished her with money "on an average of from fifty to seventy-five dollars a month" up to the time of his illness, which began about March 1, 1912, and also paid her bills. On the day before he was taken down with his last illness there was a conversation between them, a portion of which was related by Mrs. Martin, as follows: "He said to me, 'Cora, how do you feel about my coming back?' I answered, 'I want you to come back and it is a duty you owe me'; he said, 'Yes, I know, dear, and I want to come back. I am going to try again, and if I can arrange matters, I will be back next week.'" The witness also said: "During the various conversations between Mr. Martin and myself, in which we discussed returning one to the other, there were conditions imposed by me, as they should be to a wife. The condition I imposed was a will. Once he suggested deeding me a portion of the Second Street property, I expected one-third of his property; and whenever he saw fit to give me that one-third, I was willing to receive him back as a loving wife

should receive her husband. When he was taken down with his last illness, it had not been fully decided on what would be done.''

The lower court determined that, conceding ''for the sake of argument'' that the relations between Martin and his wife after the entry of the interlocutory decree were as stated by her, yet resumption of marital relations was not proven. In this we think the learned judge reached the proper conclusion. Neither Martin's visits nor his letters nor the payment of her bills nor the sending of money to her nor his words of endearment nor the sexual intercourse amounted to the abandonment of the divorce proceeding, nor the abrogation of the antecedent contract between the spouses. Both petitioners cite the case of *Wells* v. *Stout,* 9 Cal. 498, but that case, which has been followed in this and other jurisdictions, does not help appellant. There the contention was made that as Mrs. Stout gave birth to a child in 1852 (the contract was dated in 1850) access of her husband must be presumed; that access meant reconciliation, and that reconciliation avoided the agreement. The court found that reconciliation would have avoided the agreement, and while deciding that there was no sufficient proof of the birth of a child, held that even proof of access would not necessarily establish such reconciliation as would avoid the deed of trust, the court saying: ''To effect this end, the reconciliation must be permanent and be followed by cohabitation. It must be a reconciliation which restores the former relations of the parties.'' This doctrine was reasserted in the later case of *Sargent* v. *Sargent,* 106 Cal. 546, [39 Pac. 931]. Measured by this rule, the testimony of Mrs. Martin utterly fails to support her contention that the contract was set aside. Mere copulation without occupying the same habitation and dwelling there as husband and wife is by no means sufficient to sustain such a conclusion. (*Sharon* v. *Sharon,* 79 Cal. 669, [22 Pac. 26, 131]; *People* v. *Lehmann,* 104 Cal. 634, [38 Pac. 422].) By her own statement Mrs. Martin indicates that there was no reconciliation in the sense in which that word is used in the decisions, for she was imposing conditions which must be met before she would permit her husband to live at her place of abode. And she made a statement which utterly destroys the theory of complete resumption of marital relations before the death of Charles J.

Martin, because, after detailing the chief condition that she must be assured one-third of his property by deed or will, she said: ''When he was taken down with his last illness it had not been fully decided on what would be done.'' This, taken in conjunction with the undisputed fact that after the trial of the action for divorce Mr. Martin lived with his daughter is cogent proof that no conduct on the part of the spouses had set aside the contract by which Mrs. Martin waived her right to share in her husband's estate.

The orders from which these appeals are taken are affirmed.

Henshaw, J., and Lorigan, J., concurred.