[Civ. No. 7257. Third Dist. Dec. 2, 1946.]

MARY J. DEAN, Appellant, v. JAMES E. DEAN, Respondent.

Sefton & Quattrin for Appellant.

Henry W. Mahan for Respondent.

ADAMS, P. J.—Appellant and respondent were married in February, 1921, and separated for the last time about June 1, 1943. On the 27th day of September, 1944, plaintiff was granted an interlocutory decree of divorce from defendant upon the ground of his extreme cruelty. The action was tried upon the amended complaint of appellant, a cross-complaint filed by respondent, and an answer thereto. The findings of the trial court as to acts of cruelty on the part of respondent were that on several occasions he had threatened to do bodily harm to, and even kill relatives of his wife; that on one occasion he threatened to throw them out of the family home; that on several occasions he threatened to kill plaintiff; that he humiliated and offended plaintiff in the presence of friends and relatives by calling her insulting and vile names; that on several occasions

he stayed out all night and told plaintiff it was none of her business where he had been; that he made familiar remarks to boarders and visitors; and that he threatened to send plaintiff to a state insane asylum and in July, 1943, filed a petition for that purpose, which petition, after hearing, was dismissed. Allegations in defendant's cross-complaint as to cruelty on the part of plaintiff were found to be untrue.

Regarding the property of the parties, it was found to be community and included a home in Benicia, which home, together with the furniture and furnishings thereof, was, by the interlocutory decree, set apart for plaintiff, subject to further order of the court, a room therein being reserved for the use of defendant, conditioned on his good behavior. Defendant was ordered to pay off certain debts, including attorney's fees, and also to pay $10 per week for three months to allow his minor daughter to complete a business course; and the court reserved the right to make a further order for the payment of $600 due plaintiff under a prior order of the court. Other property was divided equally between the parties.

On September 29, 1945, plaintiff filed an affidavit in support of motion for a final decree of divorce, which included an allegation that the parties had not become reconciled and that no appeals had been taken from the interlocutory decree or other orders of the court. The record contains no counter-affidavit by respondent on plaintiff's motion, though it is recited that one was filed. On October 31, 1945, the trial court, after a hearing on plaintiff's motion, made an order finding that there had been "full and complete reconciliation of said parties" since the making of interlocutory decree, and that since that date the parties had "lived and cohabited together as husband and wife, with the intent and purpose thereby to thenceforth live together as husband and wife." Plaintiff's motion for a final decree was denied and it was ordered that the real property in controversy be released from all terms of the interlocutory decree, subject to a lien "on defendant's interest therein" for certain specified sums previously ordered to be paid for attorney's fees and costs.

This appeal is from the aforesaid order, it being contended by appellant that the evidence adduced at the hearing, viewed in the light most favorable to respondent, does not show a reconciliation as a matter of law and that the trial court erred in so holding; and that it abused its discretion in deciding in favor of defendant. This calls for some review of the evidence.

Mrs. Dean testified in support of her motion that she had never resumed marital relations with Mr. Dean, had never displayed any affection for him, had not cared for his personal needs, had never become reconciled to him, and did not wish to live with him as husband and wife, and that Dean had not since the interlocutory decree given her any money for her support.

Dean, testifying in opposition to plaintiff's motion, stated that about March 3, 1945, when he returned to the home after several months' absence, Mrs. Dean called him into the kitchen and "wanted a reconciliation"; that she said she did not think it was right for the court to sell the property, and they agreed that they could get more for it if they fixed it up a little bit, and they agreed that he would put in a month's labor and she would pay for the materials, and then they would put it up for sale; that he stayed there that night, but not with Mrs. Dean, but that the next night "we decided on a reconciliation," and he stayed with her that night and until about June 3d; that about June 8th and June 13th they "had another reconciliation" and cohabited in the same room as the previous time for about five days, when trouble started between them about a young girl in the house. He said that he had told his wife "he was agreeable to a reconciliation" and she had told him that met with her approval; that he had a garage down at Redwood City that took most of his time away but that he "regarded the situation as one of man and wife" up until about June 15th. On cross-examination he said they were not then in a state of reconciliation and had had no marital relations since June 13th, and that since then there had not been a great deal of affection displayed by his wife, though she had cooked several meals for him and he had cooked several for her, and they had done laundry for one another; but that Mrs. Dean had not eaten with him. He stated that on April 13th he had a witness who saw him in bed with Mrs. Dean; that his name was Walsh, he thought, and he had a room in the house; that at that time his wife wanted to deny that they had had a reconciliation so he hired Walsh to go in and see them in bed together; that he wanted a witness because Mrs. Dean had gone to her attorney and they wanted him to fix up the house "and then I could get out." Walsh was not produced as a witness and Dean admitted that he had known him only about two days.

Defendant called as a witness his sister, Mrs. March, who testified that on or about June 11th Dean called her at Ber-

keley and asked her to come to Vallejo which she did; that she arrived there about 9 o'clock at night and was met by Dean who told her that there had been a hearing and Mrs. Dean had denied that there had been a reconciliation and he wanted her as a reliable witness; that they went to the Dean house, where she slept in a back room, and that the next morning about 5 o'clock, while it was still dark, she walked down the hall to the room Dean had told her he and his wife occupied, and saw them in bed together; that she then left between 5 and 6 o'clock a. m., and took the bus to Vallejo.

 While the testimony of defendant taxes one's credulity, taken at its face value it amounts to no more than that he and Mrs. Dean slept together at different times between March 5th and June 15th. His testimony that Mrs. Dean "wanted a reconciliation," that about March 5th they "decided on a reconciliation" and that on June 8th and 13th they "had another reconciliation," that he told his wife he was agreeable to a reconciliation and Mrs. Dean told him that met with her approval, are no more than conclusions of the witness. (See *Kronman* v. *Kronman*, 129 Cal.App. 10, 15 [18 P.2d 712]; *Ruggles* v. *Bailey*, 15 Cal.App.2d 555, 557 [59 P.2d 837]; *Keller* v. *Keller*, 122 Cal.App. 712, 715 [10 P.2d 541].) And unless it can be said that the evidence of cohabitation — though specifically denied — constituted "the full and complete reconciliation" found by the court, such finding is without support in the record. It is to be noted that there is no testimony aside from testimony that the parties slept together to show that they ever resumed the normal way of life of a married couple. There is no evidence that they ate together at the same table, that Mrs. Dean performed for respondent the usual household duties performed by a wife for a husband, that they evidenced any affection for one another, performed for one another any acts of conjugal kindness, went out together, were seen together by relatives or friends or by others residing in the house, told anyone they had become reconciled, or that Dean assumed any duties of a husband by way of rendering any services to his wife or contributing anything to the household expenses; and there is nothing stated as to any agreement on the wife's part to condone the offenses of which the trial court found him guilty on granting the interlocutory decree. Furthermore, respondent's own testimony that he secured a total stranger to invade the privacy of the marital chamber for the purpose of

seeing the parties in bed together, and his procuring his sister to come to the home secretly in the night for a like purpose because Mrs. Dean was denying that any reconciliation had taken place, show not only a complete disregard for the privacy of the marital relations, but indicate that Dean himself knew that there had not been a complete, if any, reconciliation. Also the very purpose for which, as he states, a reconciliation was agreed upon, was to prevent the sale of the house by order of court, in its then condition, and to secure a better price therefor by making certain repairs. And he testified to nothing indicating any intention on the part of Mrs. Dean to abandon her right to a final decree of divorce or to restore him to marital rights.

The record in the case shows that after the interlocutory decree several orders to show cause were issued at the request of plaintiff, or her attorney, one on November 13, 1944, in support of which an affidavit was filed alleging that defendant had not made the payments ordered by the court and had collected rental from the premises awarded to plaintiff; and another on February 7, 1945, supported by an affidavit of plaintiff that defendant had not made the payments ordered, that he had not taken employment as agreed, and that he had remained in the home and harassed and annoyed her. Hearings on these orders were continued from time to time and were pending undisposed of up to the actual time of the hearing on motion for a final decree.

Evidence introduced in rebuttal by plaintiff consisted of testimony of the two sons of the parties, and three persons who resided in the house as boarders or roomers. One of said roomers testified that she was in the house from the middle of April until early in July and that she never saw any display of affection between husband and wife, and that they did not, that she knew of, occupy the same room. Another roomer who had been there since July stated that he noticed friction between the parties, that there was no love, but "strictly an antagonistic attitude." Another testified that she was in the house from December on; that Mrs. Dean acted "very nice and polite," but that "he was continually raving all the time." This witness further testified that she never saw Dean until she had been in the house about four months, and that during the period when respondent contends he was sleeping with Mrs. Dean, the latter was actually sleeping with the witness, sometimes in Mrs. Dean's room and at other

times in the girl's room across the hall. One of the sons of the parties testified that he returned home after army service the first week in July and that he had seen "nothing more than a stiff antagonism, and open antagonism" between his parents. Another son testified that he was in his parents' home in May for one night, and had been there continuously since July, and that he observed between his father and mother the "same friction that has existed for years, always bickering with each other."

From the over-all picture thus presented we think that the trial court erred as matter of law in finding that there was a reconciliation between the parties. In *Hawkins* v. *Hawkins,* 104 Cal.App. 608 [286 P. 747], it was contended by the defendant in his answer to plaintiff's complaint for divorce that plaintiff had condoned the offenses for which she sought her divorce. This court said, p. 611: "The most that may be said regarding the issue of condonation in the present case is that the spouses discussed a reconciliation of their domestic troubles; that the respondent agreed to condone her husband's offenses and return to him 'for the sake of the children,' and that they went together to a show and slept together one night in a hotel. We are of the opinion this does not have the effect of consummating condonation." Also it said: "But assuming that the statement which was testified to by the appellant that they agreed 'to condone and to resume marital relations' sufficiently fulfills the requirement of the statute with respect to reconciliation and remission, there still is an absence of evidence of 'restoration of the offending party to all marital rights,' unless it may be said that a single act of cohabitation of the spouses which is accomplished in the rented room of a hotel, fulfills this requirement. We think it is insufficient under the circumstances of this case to constitute a consummation of condonation. The statute requires a restoration to all marital rights. It is not claimed there was a restoration to any marital rights in the present case, except the right of cohabitation on a single occasion. There is a clear distinction between the ordinary construction of the term 'marital relations' and the statutory term of 'all marital rights.' The conjugal rights of married persons include the enjoyment of association, sympathy, confidence, domestic happiness, the comforts of dwelling together in the same habitation, eating meals at the same table, and profiting by the joint property rights as well as the intimacies of domestic relations. It has

been repeatedly held that condonation of acts of extreme cruelty is not accomplished by sexual intercourse alone.'' (With citations.)

In *Bohnert* v. *Bohnert,* 95 Cal. 444, 446 [30 P. 590], which was cited in the Hawkins case, the court said that ''restoration of the offending party to all marital rights'' (Civ. Code, sec. 116) is not proved by evidence of sexual intercourse alone.

Civil Code section 116 provides that it is necessary to the condonation of matrimonial offenses that the offending party be restored to ''all marital rights''; section 117 provides that condonation implies a condition subsequent—that the forgiving party must be treated with conjugal kindness; and section 118 recites that where the cause for divorce consists of a course of offensive conduct, or arises, in cases of cruelty, from excessive acts of ill-treatment which may, aggregately, constitute the offense, cohabitation, or passive endurance, or conjugal kindness shall not be evidence of condonation of any of the acts constituting such cause, unless accompanied by an express agreement to condone.

In *Estate of Martin,* 166 Cal. 399, 402 [137 P. 2], where it was contended that there had been condonation and a reconciliation between decedent and his divorced wife after the interlocutory decree, the court said that visits of the husband to the wife, letters written by him to her in endearing terms and expressing a desire to come back to her, the sending of money to her and the payment of her bills, together with sexual intercourse between the parties, was insufficient to amount to an abandonment of the divorce proceedings by the husband.

In *Keller* v. *Keller,* 122 Cal.App. 712, 715 [10 P.2d 541], where there was evidence that after an interlocutory decree of divorce the parties occupied an apartment together and conjugal intimacies were permitted by the wife, the court said that this would not be a controlling circumstance (citing *Hawkins* v. *Hawkins, supra*); and that where the parties were of mature age and had no children, and the wife at the hearing had expressed her irrevocable determination not to live with defendant again, and where ground for divorce had been established by an interlocutory decree which had been unassailed until the application for a final decree, ''the courts then have their duty to abide by their records and follow the written law, unless there is *clear and cogent proof of reconciliation and resumption of connubial relations,* or some other legal ground for denying dissolution of the marriage.'' (Ital-

ics ours.) And it was there said, quoting from *Drew* v. *Drew*, 250 Mass. 41, 45 [144 N.E. 763], that "Reconciliation, like condonation, is a state of mind to be determined from all the evidence including rational inferences." And in *Estate of Boeson*, 201 Cal. 36 [255 P. 800], it was said, at pages 42-43, that "Before a court may indulge in a presumption of revocation, however, the evidence offered to establish full resumption of marital relations must be sufficient to satisfy the mind of the court that such was the intent of the parties." The testimony that was relied upon as sufficient to show a resumption of such relations was that of the wife (who claimed reconciliation) that at the time the interlocutory decree was granted she was residing in a seven-room house which she owned as her separate property; that she continued to reside in said house after the granting of the decree, renting all rooms in the house, except the dining-room and kitchen, to tenants; that she and decedent became reconciled about September, 1921; that decedent did not make his home with her because of the crowded conditions of her living quarters, but that he visited her, sometimes as frequently as two or three times a week, upon occasions took her to theaters, ate meals with her at her residence and occasionally spent the night with her there; that it was the mutual desire of decedent and herself that she should sell her house and that they should then build a cottage at Palo Alto, where she believed her health, which was poor, would improve; that she did not wish to reserve a larger number of the rooms in her house for her own use so that her husband might live with her, because she believed that the house would sell more readily if most of the rooms were rented, and that decedent offered to contribute to her support, but she refused his offers because she wished him to save as much as possible to be used later in building the house at Palo Alto. She also produced four witnesses who testified that they had seen the husband about appellant's house, eating with her, hanging pictures and otherwise conducting himself in a manner which would indicate that they had resolved their matrimonial differences. The court said, page 45: "Giving the fullest effect possible to the facts testified to by appellant, it appears from her testimony that she and decedent had not established a matrimonial domicile at the residence owned by her or at any other place. The fact that decedent on occasions spent the night with appellant at said residence and upon occasions ate meals with her

there and assisted her in making minor repairs about the premises does not establish said residence as the matrimonial domicile of the parties. . . . While the lack of a fixed joint domicile will not under all circumstances prevent the existence of a state of marital cohabitation, it is a factor to be considered."

In the case before us the burden was upon defendant, in order to defeat the right of plaintiff to a final decree, to show that there had been a bona fide reconciliation and condonation of past offenses, followed by the restoration of defendant to all marital rights with the intention that thenceforth the parties should live together as husband and wife. In our opinion defendant failed to meet this burden, and plaintiff is entitled to a final decree of divorce as prayed.

The order appealed from is reversed with directions to the trial court to enter such final decree.

Peek, J., and Thompson, J., concurred.