[Civ. No. 21511.   First Dist., Div. One.   July 30, 1964.]

ALICE  POLK,  Plaintiff  and  Appellant,  v.  CHARLES
POLK, Defendant and Respondent.

Raymond H. Hawkins and Carl B. Munck for Plaintiff and Appellant.

Malcolm Burnstein and Edises, Grossman & Grogan for Defendant and Respondent.

MOLINARI, J.—This is an action by plaintiff, Alice Polk, to recover the proceeds of insurance upon the life of her husband, Percy Polk, under a group life insurance policy issued by defendant The Equitable Life Assurance Society of the United States to defendant Colgate-Palmolive Company, in which action the insurance company cross-complained to interplead the parties claiming the proceeds thereof, namely, Alice Polk and defendant Charles Polk.

The trial court sitting without a jury awarded plaintiff $1,400 as her community interest in the total proceeds of $6,800, and the balance thereof to Charles Polk. Plaintiff appeals from the judgment entered by the court and from the order denying her motion to vacate the judgment and enter a different one.[1]

Alice Polk (hereinafter called Alice), married Percy Polk (hereinafter called Percy), on November 29, 1947. At the time of his marriage and until his death Percy was an employee of Colgate-Palmolive Company (hereinafter called Colgate). The Equitable Life Assurance Society of the United States (hereinafter called Equitable), issued a group life insurance policy to Colgate insuring the lives of eligible employees. Pursuant to said group policy Percy was issued a life insurance certificate, with an effective date of February 4, 1948, in the amount of $300, and another such certificate,

---

[1]An order of denial of a motion to vacate a judgment and enter a different one under Code Civ. Proc., § 663, is appealable as a special order after final judgment under Code Civ. Proc., § 963, notwithstanding that the same grounds could be urged on an appeal from the judgment. (*Socol* v. *King*, 34 Cal.2d 292, 296 [209 P.2d 577]; *Sinclair* v. *Baker*, 219 Cal.App.2d 817, 820 [33 Cal.Rptr. 522].)

with an effective date of February 4, 1948, in the amount of $3,000. The amount of this latter certificate was subsequently increased to $6,000 and again increased to $6,500, which amount was in force at the time of Percy's death. All premiums for the insurance were paid subsequent to the date of the marriage. Sometime in 1949 Percy departed the residence occupied by him and Alice. From August 1952 up and until May 29, 1961, the date of his death, Percy lived with one Eleanora Hanspard in the relationship of husband and wife, although his marriage to Alice was never legally terminated.

When the aforementioned certificates of insurance were issued, Alice was designated the beneficiary thereof. Effective July 1, 1954, Percy changed the beneficiary designation to his brother, Charles Polk (hereinafter called Charles), respondent on this appeal. This designation remained in force at the time of Percy's death. Following his death, Alice commenced this action to recover proceeds of the insurance and for general relief. Equitable deposited $6,800, being the total proceeds of both insurance certificates, with the clerk of the court. Pursuant to stipulation, $200 was ordered paid as attorney's fees for Equitable and Colgate.[2] Prior to trial the sum of $3,000 was released to Charles out of the said proceeds on deposit. Although the record does not disclose how or in what manner such release was effected, it was stated in the respective pretrial statements and in the pretrial order that said sum of $3,000 was released to Charles. Consequently, at the time of trial a total of $3,600 remained on deposit with the court.

Based on the testimony, the trial court found that Percy was abandoned by Alice in late 1949 and continuously thereafter; that Alice was not justified by any misconduct on Percy's part in abandoning him, and also that Alice never offered to return to him prior to his death. The court further found that all premiums for the said life insurance represented deductions from Percy's earnings at Colgate and premiums contributed by Colgate, and that the latter pay-

[2]Originally both Equitable and Colgate were defendants in the case. As noted, Equitable filed a cross-complaint in the nature of interpleader alleging that it had no interest in the insurance proceeds and was willing to deposit the amount in dispute with the clerk of the court. The parties entered into a stipulation wherein it was agreed that upon deposit of the disputed insurance proceeds by Equitable with the clerk of the court, a judgment would be entered discharging Equitable and Colgate from all further liability with respect to any such insurance.

ments constituted earnings. The court also found that the change of beneficiary was without the knowledge and consent of Alice.

Crucial to the determination of this appeal is the question whether Alice abandoned Percy within the meaning of section 175 of the Civil Code[3] which provides, in pertinent part, as follows: ''A husband abandoned by his wife is not liable for her support until she offers to return, unless she was justified by his misconduct, in abandoning him, and the earnings of the husband during the period of unjustified abandonment, prior to such offer, are his separate property; . . . '' The last mentioned proviso was added to section 175 by amendment in 1955. Charles concedes that Percy's earnings prior to the effective date of the 1955 amendment were not separate, but community property. He urges, however, that the earnings took the character of separate property from and after the effective date of the said amendment on September 7, 1955. Alice contends that the finding of abandonment is not sustained by the evidence, and that, moreover, even if such a finding is sustainable it cannot be predicated, in view of the provisions of section 175 prior to the 1955 amendment, on an abandonment occurring in 1949, but must be based upon the facts and circumstances existing on the effective date of the said amendment.[4]

The testimony adduced on the issue of abandonment was substantially as follows: Charles testified to several conversations between Alice and Percy in his presence. He testified that Alice objected to Percy's alleged association with other women; his failure to return home on time; and to his mistreatment of her. He also stated that Alice threatened to eject Percy from their home. Charles testified further that Percy was not in the company of other women because Percy was usually in his company and that of another brother, Jethro; and that Percy denied his wife's accusations. Charles' wife, Willie Mae, testified that Alice complained to her that Percy was seeing many women, and accused her of allowing Percy to meet other women in her home. Willie Mae stated that Alice threatened to eject Percy from the house

---

[3]Unless otherwise noted all statutory references are to the Civil Code.

[4]Prior to 1955, § 175 read as follows: ''A husband abandoned by his wife is not liable for her support until she offers to return, unless she was justified, by his misconduct, in abandoning him; nor is he liable for her support when she is living separate from him, by agreement, unless such support is stipulated in the agreement.''

because of his conduct. Willie Mae also testified that Percy never met other women at her home; that she had never seen Percy in the company of other women; and that he never stayed away from Alice's house an entire night prior to the time of his departure therefrom. John Gordon, a friend of Percy, testified that he was present at conversations between Alice and Percy in which Alice told Percy "to get out, she was tired of fooling around with his mess, with him running around with other women." Gordon also stated that Percy denied his wife's accusations, and that when Percy visited him at his hotel he did not meet any women there. Gordon testified, further, that late in 1949, Alice deposited Percy's clothes in the hallway of their home; that she "told him to get out, that she didn't want him"; and that Percy took his clothes, put them in his car, and moved to a hotel.

Alice took the stand as a rebuttal witness and testified as follows: that Percy beat, kicked and cursed her on numerous occasions; that he knocked her out and nearly paralyzed her brain; that he threw Cayenne pepper in her eyes; that he would keep his money and checks. She further testified that Percy would leave home for several days and nights, sometimes for a whole week; that he upset her too much, and that she saw him with other women. Alice's cross-examination on rebuttal was not completed because of the trial court's adjournment for the day. When court convened the following morning, Alice was not present.[5] Defense counsel thereupon moved that Alice's rebuttal testimony be stricken on the ground that her nonappearance precluded his right of cross-examination. The court reserved its ruling on the motion "until the end of the case. . . . " However, the record does not indicate whether the court formally ruled on the motion. Alice contends that since the court made no ruling, her rebuttal testimony remains in the record as valid evidence. Charles contends that the record shows the trial court and all counsel were proceeding on the assumption that Charles' motion to strike the rebuttal testimony was granted. This assumption is without foundation in the record.

█ It is the general rule that where a court reserves its ruling, but does not decide the point, the failure to rule formally is an implied ruling against the objection and in favor of admissibility if the objection is untenable and the court finds in accordance with the evidence. (*Clopton* v.

[5] Alice did not thereafter make any appearance at the trial.

*Clopton*, 162 Cal. 27, 32 [121 P. 720] ; *Alocco* v. *Fouche*, 190 Cal.App.2d 244, 252 [11 Cal.Rptr. 818] ; *Piercy* v. *De Fillipes*, 215 Cal.App.2d 284, 289 [30 Cal.Rptr. 62].) This rule, however, is subservient to the paramount principle that where cross-examination concerning a matter at issue is improperly denied, it is a denial of due process, and prejudice must be presumed. (*People* v. *Redwine*, 166 Cal.App.2d 371, 376-377 [333 P.2d 188] ; *McCarthy* v. *Mobile Cranes, Inc.*, 199 Cal.App.2d 500, 506-507 [18 Cal.Rptr. 750] ; *Columbia etc. Steel Div.* v. *Industrial Acc. Com.*, 115 Cal.App.2d 862, 865 [253 P.2d 45] ; *In re Shackelford*, 116 Cal.App.2d 864, 867 [254 P.2d 610].) ■ Accordingly, a party has an absolute right to cross-examine a witness, and the denial of such right or the inability to exercise it because of the nonappearance of the witness results in the denial of a fair hearing. (*People* v. *Redwine, supra*, at p. 377. ■ Where a party is deprived of the cross-examination of a witness by the act of the opposite party or by the refusal to testify or other misconduct of the witness, the testimony given on the examination in chief should be stricken out. (*People* v. *McGowan*, 80 Cal.App. 293, 296-298 [251 P. 643] ; *People* v. *Seitz*, 100 Cal.App. 113, 119 [279 P. 1070] ; *People* v. *Manchetti*, 29 Cal.2d 452, 461-462 [175 P.2d 533].)

■ In the light of these principles, therefore, the court should have stricken Alice's rebuttal testimony and it was error not to do so. It is apparent, however, that the error is not prejudicial. In view of the court's finding on the issue of abandonment in favor of Charles he was not prejudiced by the admission of the rebuttal evidence. ■ "It is the general rule that a respondent in whose favor a judgment is rendered is interested only in maintaining the judgment, and he cannot on an appeal of the opposite party ask a court of review to consider any errors against him, even though the errors of which the respondent complains were objected to by him in the trial court and are argued or discussed in the respondent's brief. [Citation.] The exception to this rule is that provided by the 1957 amendment to Code of Civil Procedure section 956 which provides that the respondent, or party in whose favor the judgment was given, may, without appealing from the judgment, request the court to and it may review the matters reviewable on appeal from the judgment *for the purpose of determining whether or not the appellant was prejudiced* by the error or errors upon which he relies for reversal or modification of the judgment from

which the appeal is taken. [Citations.]" (*Auer* v. *Frank*, 227 Cal.App.2d 396, 404-405 [38 Cal.Rptr. 684].) In the case at bench, appellant plaintiff is not claiming error in the admissibility of such evidence, but urges that this testimony remained in the record and was, therefore, sufficient to rebut the finding that Percy was abandoned by her and that she never offered to return to him prior to his death. Under the state of the record, and in conformity with the foregoing principles, we must assume that the trial court considered Alice's rebuttal testimony and, as the trier of fact, determined the credit and weight to be given such testimony.

The important question is whether there are sufficient facts showing an abandonment of Percy by Alice. Research reveals no California case defining the meaning of "abandonment" as that term is defined in section 175. ██ We are satisfied, however, that "abandonment" is synonymous with "willful desertion" as that term is used by the statutes dealing with the dissolution of marriage[6] and as defined and applied by our appellate courts. ██ In Black's Law Dictionary (3d ed. 1933) abandonment is defined as: "The act of a husband or wife who leaves his or her consort willfully, and with an intention of causing perpetual separation." In *Ottinger* v. *Ottinger*, 141 Cal.App.2d 220 [296 P.2d 347], the reviewing court was called upon to interpret section 175 as it read prior to the 1955 amendment. There the action was one for divorce based on the husband's alleged desertion of his wife. He contended that his wife had deserted him and that therefore she was not entitled to share in his earnings during the period of separation. In upholding the finding that the husband deserted the wife, the appellate court held that his earnings during the separation were community property, and that the wife's rights were vested, and that they could not be divested by the 1955 amendment to section 175. It is significant to note that while the reviewing court did not expressly undertake to define abandonment it equated the meaning of the term, as used in section 175, with desertion. Similarly, in *Norwich* v. *Norwich*, 170 Cal.App.2d 806 [339 P.2d 574], it was held that under section 175, as amended in 1955, the earnings of a husband after the date of the wife's unjustified desertion were his separate property. It is apparent from a reading of *Ottinger* and *Norwich* that the courts encountered no difficulty in applying section 175 to facts amounting to

---

[6]See §§ 95 to 101, inclusive; 103 and 104.

desertion. We are accordingly persuaded that there is no logical or semantical difference between abandonment and desertion.

Related precedents in this state equate abandonment to desertion. In order to prove abandonment of a child by a parent, " 'there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' " (*Guardianship of Snowball*, 156 Cal. 240, 243 [104 P. 444]; *Guardianship of Rutherford*, 188 Cal.App.2d 202, 206 [10 Cal.Rptr. 270]; *In re Jones*, 131 Cal. App.2d 831, 834 [281 P.2d 310]; *Guardianship of Marshall*, 124 Cal.App.2d 807, 810 [269 P.2d 160, 936].) Respectable authorities in other jurisdictions use the terms "abandonment" and "desertion" interchangeably. In *Watson* v. *Palmer*, 219 Ark. 178 [240 S.W.2d 875, 876], it was stated: " 'Desertion or abandonment consists of the separation of one spouse from the other without consent or justification, and with the intention of not returning.' " In *State* v. *Carson*, 228 N.C. 151 [44 S.E.2d 721, 722], it was said: "Abandonment is more than mere separation. It is desertion—an unjustifiable separation coupled with the discontinuance of the marital obligation to support."

Section 95 defines "desertion" as "the voluntary separation of one of the married parties from the other with intent to desert"; and in section 96 it is provided that "the refusal of either party to dwell in the same house with the other party, when there is no just cause for such refusal, is desertion." In section 98 it is provided that "Departure or absence of one party from the family dwelling-place, caused by cruelty or by threats of bodily harm from which danger would be reasonably apprehended from the other, is not desertion by the absent party, but it is desertion by the other party." Other significant sections are section 99, which provides that "Separation by consent ... is not desertion," and section 101, providing that "Consent to a separation is a revocable act, and if one of the parties afterwards, in good faith, seeks a reconciliation and restoration, but the other refuses it, such refusal is desertion." Pertinent also is section 102 which reads as follows: "If one party deserts the other, and before the expiration of the statutory period required to make the desertion a cause of divorce, returns and offers in good faith to fulfill the marriage contract, and solicits condonation, the desertion is cured. If the other party

refuse such offer and condonation, the refusal shall be deemed and treated as desertion by such party from the time of refusal.''[7] In *Keesey* v. *Keesey*, 160 Cal. 727 [117 P. 1054], it was held that willful desertion is manifested by the refusal of either party to dwell in the same house with the other when there is no just cause for such refusal. And in *Danielson* v. *Danielson*, 100 Cal.App. 168, 172 [279 P. 1052], the appellate court adopts two pertinent statements from respected authorities as follows: '' 'It is immaterial which of the married parties leave the marital home, the one who intends bringing the cohabitation to an end commits the desertion' '' (quoting from 2 Bishop on Marriage and Divorce, p. 597); and '' 'The party who drives the other away is the deserter, and a wife may drive her husband away' '' (quoting from *Hudson* v. *Hudson*, 59 Fla. 529, 532 [51 So. 857, 21 Ann.Cas. 278]).

Turning to the instant case in the light of the foregoing principles, we are satisfied that the evidence was sufficient to support the finding that Alice abandoned Percy. It is not for us to retry the factual issues, but to adhere to the well-established rule that the trial court is the exclusive judge of questions of credibility of witnesses and weight of evidence, and that the determination of the trial court upon questions of fact is conclusive upon this court where there is any evidence fairly tending to support that determination. In the present case the evidence was such as to support the inference that the separation was not merely one by consent but one made with an intention to desert. There is ample evidence to support the inference that Alice intended to bring about a cessation of the marital relationship between herself and Percy, and that the conjugal schism, extending over a period in excess of 11 years, was of a permanent nature. In *Hager* v. *Hager*, 174 Cal.App.2d 546 [345 P.2d 68], the facts were somewhat similar to those in the case at bench. There it was held that a finding of desertion was supported by evidence which showed that a husband who had been jailed for 14 days, upon his return home, found himself unwelcome, was told by his wife that she did not want him around, that he was not to come around bothering her but was just to give her money, and that the husband left and

---

[7] § 107 provides that willful desertion must continue for one year before it is a ground for divorce.

went to live with a friend and occasionally returned to visit the children.

Alice's testimony, on rebuttal, that all she intended was a temporary separation to endure only until Percy reversed his objectionable conduct; that he committed certain acts of cruelty towards her; that he consorted with other women; that she forgave him and offered to return to him in 1950, constitute evidence which the trial court weighed against the evidence adduced by Charles that Percy did not consort with other women; that Alice's accusations were without foundation; that she packed Percy's bags and told him to leave; and that she didn't want him. It should be here noted that the trial court, as the judge of the credibility of witnesses was entitled to reject all of Alice's testimony. ▮ The trier of fact, as the exclusive judge of the credit and weight to be given the testimony of a witness, may reject such testimony even though uncontradicted or unimpeached when he does not act arbitrarily but does so upon sound and relevant considerations, such as the inherent improbability of the statements, the interest of the witness in the case, his motives, and the manner in which he testifies. (*Camp* v. *Ortega*, 209 Cal.App.2d 275, 283 [25 Cal.Rptr. 837]; *La Jolla Casa de Manana* v. *Hopkins*, 98 Cal.App.2d 339, 345-346 [219 P.2d 871]; *Huth* v. *Katz*, 30 Cal.2d 605, 608-609 [184 P.2d 521].)

▮ Accordingly, under the state of the record, the trial court was not only justified in the inference that Alice abandoned Percy, but also that she made no offer to return to him during the period of the separation.

Alice contends the finding that she never offered to return to Percy is without evidentiary support. She asserts that it was Charles' burden to establish the separate property character of Percy's earnings, and that therefore it was not only his burden to establish that she abandoned Percy but also that she did not offer to return to him. It is apparently Alice's position that the failure to offer to return is implicit in the concept of abandonment, and that in order to establish an abandonment there must be a showing that there was no offer to return. ▮ We do not agree with this contention, but are satisfied, from a reading of section 175, that "abandonment" and "offer to return" are separate concepts. This is evident from the language of the section which reads "A husband abandoned by his wife is not liable for her support *until* she offers to return, . . . and the earnings of the husband during the period of unjustified abandonment, *prior*

*to such offer*, are his separate property; ..." (Italics added.) ▮ It is clear that the period of unjustified abandonment continues until the offer to return. In *Kessler* v. *Kessler*, 2 Cal.App. 509 [83 P. 257], it was held that under section 175 a husband who has been abandoned by his wife is not required to solicit her return, that it was the wife's duty to offer to return and that until she did so no obligation of support rested upon her husband. Of interest is *Plath* v. *Industrial Acc. Com*, 109 Cal.App. 349 [293 P. 89], where workmen's compensation was denied to the widow of a deceased employee. There was direct testimony showing that the wife left the home of the deceased with intent to remain away from him and to never return. There was no evidence that the wife ever offered to return. Under this state of the record the reviewing court upheld the Commission's finding that under section 175 the deceased was not liable for the support of his wife. It is apparent that *Plath* did not consider it incumbent upon the employer, who was invoking section 175, to show negatively that the wife did not offer to return to the deceased. Although the court did not discuss upon whom rested the burden of showing an offer to return, it is clear that it considered such burden to be the wife's. This conclusion finds support in other language in the opinion having to do with whether the abandonment under section 175 was justified. On page 351 the court stated: "It was not necessary to show negatively that such leaving was without cause. As was said in *Morrison* v. *Morrison*, 20 Cal. 431, at page 432, 'The plaintiff is not required to show negatively that no cause existed, for none appearing, the law will not presume one.' " Under section 175 there is no abandonment by a wife where it is justified by the husband's misconduct. ▮ Accordingly, if the burden is upon the wife to show such justification, it is equally reasonable that the burden of negating abandonment by showing an offer to return should be imposed upon her because it is her duty to offer to return. In *Sheppard* v. *Sheppard*, 15 Cal.App. 614 [115 P. 751], it was held that an "offer to return" must be made in good faith and that the question of good faith is one of fact to be determined by the trial court. (See also *McMullin* v. *McMullin*, 123 Cal. 653 [56 P. 554].) In *Sheppard* the offer to return, which had been urged as an affirmative defense in the husband's answer to the wife's cross-complaint, was found to be unsupported by the evidence. ▮ We are persuaded, moreover, that the "offer to return," in its implication,

is similar to "condonation" in divorce actions. Condonation is an affirmative defense which should ordinarily be pleaded as new matter; however, if the evidence at trial reveals condonation, the court should so find, even though it is not pleaded. (*Hunter* v. *Hunter*, 132 Cal. 473, 476 [64 P. 772]; *Stampfli* v. *Stampfli*, 53 Cal.App. 126, 129-130 [199 P. 829]; *Neeley* v. *Neeley*, 179 Cal. 232, 234 [176 P. 163]; *Hamburger* v. *Hamburger*, 60 Cal.App.2d 530, 536-537 [141 P.2d 453]; Chadbourn, Grossman, Van Alstyne, 2 Cal. Pleading, § 1604, p. 615; Code Civ. Proc., § 462.) The burden of establishing such defense is upon the party urging it. (*Dean* v. *Dean*, 77 Cal.App.2d 98, 106 [174 P.2d 705]; Chadbourn, Grossman, Van Alstyne, 2 Cal. Pleading, § 1554, p. 590.) In *Neeley*, we find the following pertinent language: "Condonation was not a part of her case. It was new matter, properly pleaded in the answer. The plaintiff was not required to anticipate it in her complaint, but had the right to meet it by any appropriate proof." (P. 234.) ▮ In the instant case, accordingly, the burden of proving an "offer to return" was upon Alice, and not upon Charles. From an examination of the evidence, as disclosed by the record, we cannot say that the trial court erred in finding "that Alice Polk never offered to return to Percy Polk prior to his death."

▮ It is further contended by Alice that even if it be found that she abandoned Percy in 1949, section 175 is nevertheless inapplicable because the 1955 amendment is not retroactive. The gist of her argument is that her justification for abandoning Percy must be measured not as of the time she abandoned Percy, but as of September 7, 1955, the effective date of the amendment to section 175. She asserts that since Percy was then living meretriciously with Eleanora, her abandonment was at that time no longer unjustified. Alice cites no authorities in support of these contentions. We find no merit in her assertion. As held in *Ottinger* v. *Ottinger*, *supra*, 141 Cal.App.2d 220, there is no question that the 1955 amendment is not retroactive. This holding does not, however, imply that the abandonment itself must occur subsequent to the amendment. The proviso in section 175 relative to abandonment was not changed by the subject amendment. The only effect of the amendment was to make the husband's earnings, where he was abandoned by the wife, his separate property. In *Ottinger* the husband abandoned his wife in 1937. Although the reviewing court held that the husband's earnings between 1937 and 1953 (when the parties were di-

vorced) were community property because the 1955 amendment was not retroactive, it nevertheless took cognizance of the abandonment occurring in 1937. In *Norwich* v. *Norwich, supra,* 170 Cal.App.2d 806, *the wife abandoned the husband on March 28, 1955.* It was there held that the sum of $3,500 saved from the husband's earnings after January 10, 1956, and an automobile purchased from such earnings after said date, were the husband's separate property. Implicit in the decision, which involved other property found to be community, is the rationale that the husband's earnings prior to the effective date of the 1955 amendment were community property. We should also mention that there is no evidence in the record, aside from the conversation in 1950 when Alice asked Percy to "come back," that she communicated with, or even saw him from 1949 to 1955, or that she knew of his illicit association with Eleanora. Accordingly, Alice's assertion that Percy's association with Eleanora rendered him unavailable to resume the marital relationship is pure speculation. ▮ We are satisfied, moreover, that the applicable principles, distilled from the cases hereinbefore cited, require that we hold that once an abandonment is established it continues to exist in the absence of proof of an offer to return.

Alice further argues that the trial court was not justified in finding that the insurance premiums which were paid by Colgate were Percy's "earnings." She relies on certain testimony of Mrs. Phillips, a payroll clerk for Colgate for nine years, who testified that she was familiar with writs of attachment and execution served on Colgate; that she determined what an employee had due him at the time of levy; and that, in computing the amount of earnings to which the employee was entitled, the amount contributed to Equitable by Colgate was not included. She also stated that the amount contributed by Colgate was not included as earnings in a particular employee's W-2 form. Relying upon *O'Connor* v. *Travelers Ins. Co.,* 169 Cal.App.2d 763 [337 P.2d 893], and *Estate of Foy,* 109 Cal.App.2d 329 [240 P.2d 685], Alice contends that since the amounts contributed by Colgate were not "earnings" they do not come within the purview of section 175. The *O'Connor* case is not in point. There the wife's employer paid all the premiums on two life insurance policies directly to the insurance company. No deductions for such premiums were made from the wife's salary. The wife named her son as the beneficiary. Upon her death her husband claimed one-half of the proceeds of said policies on the

ground that the premiums represented earnings of his wife during marriage and, as such earnings, the premiums were community property. The appellate court upheld the finding of the trial court that the proceeds of the policies were not community property upon the ground that the evidence supported a finding that the husband had relinquished to the wife the right to her earnings during marriage. The reviewing court noted that the lower court found that the employer paid the premiums as a voluntary contribution and that they were not a part of the wife's earnings, but found it unnecessary to consider this finding. The court made the following statement: "Even if the premiums should be regarded as a kind of fringe benefit incident to her employment, it would not follow that such a benefit was community property. The acts and conduct of the husband with reference to the earnings the wife actually received in cash would indicate that he would also allow the wife to treat the fringe benefit (which was not cash received) as her own in the same manner as he allowed her to treat her cash earnings as her own." (P. 767.) *Estate of Foy*, on the other hand, is in point, and, contrary to Alice's contention, supports the conclusion that employer-paid premiums are compensation for services. There the employer paid the premiums on a $10,000 life insurance policy on the life of the husband employee. No deductions therefor were made from the employee's salary. The appellate court, in affirming the lower court's determination that the proceeds of the insurance policy were community property, held that they were not intended as a gift to the employee but "as a part of the compensation for his services." (P. 333.) The court stated: "Its [the $10,000] relation to decedent may be assimilated to the retirement fund accumulated for the benefit of an employee during his tenure. It was intended by both employer and decedent as a reward for services performed. Decedent's services paid the premiums." (P. 333.) In *Estate of Worley*, 87 Cal.App.2d 760 [197 P.2d 773], an employee of a government contractor doing government work on Wake Island during World War II was captured by the Japanese and held prisoner for over three years until his death. A federal statute allowed compensation for injury, death or detention of such employees, payable to the employee or his dependents. The amount paid by the government was held to be community property as the proceeds of earnings upon the rationale that the payments were intended as compensation for loss of earnings and were, in effect, a

continuation of wages. ▮▮▮ We are satisfied that in the present case the trial court, notwithstanding Mrs. Phillips' testimony with respect to the treatment of Colgate's contributions in garnishment cases and on the employees' "W-2 forms," was entitled to infer that the premiums were paid as additional compensation for services rendered and that there was no real donative intent present. Accordingly, we agree with the conclusion reached by the trial court that the premiums paid by Colgate were earnings within the meaning of that term as used in section 175. ▮▮▮ It should be observed, moreover, that if these premiums constituted a gift, then the proceeds of the insurance policies attributable to such premiums would be Percy's separate property.

Alice contends the rule that an apportionment must be established where property is acquired by separate and community funds cannot be followed in this case because there are two separate policies of insurance. This rule requires a determination of the premiums paid for each policy, and the portions thereof which constituted separate and community property. Alice asserts that the court's findings of fact do not make such a determination but merely show a commingling of both kinds of property, therefore compelling the result that the insurance proceeds are community property. She asserts, therefore, that she is entitled to a recovery of not less than one-half of the total insurance proceeds. Preliminary to detailing the factual content of this issue, we set forth certain applicable legal principles. ▮▮▮ The proceeds of an insurance policy on the life of a husband are community property to the extent that the premiums were paid with community funds. (*Travelers Ins. Co.* v. *Fancher,* 219 Cal. 351, 353 [26 P.2d 482]; *Dixon Lumber Co.* v. *Peacock,* 217 Cal. 415, 418 [19 P.2d 233]; *Estate of Foy, supra,* 109 Cal. App.2d 329, 333; *Estate of Sears,* 182 Cal.App.2d 525, 530 [6 Cal.Rptr. 148]; *Field* v. *Bank of America,* 100 Cal.App.2d 311, 314-315 [223 P.2d 514]; *Johnston* v. *Johnston,* 106 Cal. App.2d 775, 779 [236 P.2d 212].) ▮▮▮ In *Modern Woodmen of America* v. *Gray,* 113 Cal.App. 729, 733-734 [299 P. 754], it was stated: "Where, as here, the life insurance is paid for partly with community and partly with separate funds the proceeds of the policy should in our judgment be apportioned in the same ratio that the amount of such community funds paid for premiums bears to the amount of separate funds paid for such purpose." (See *New York Life Ins. Co.* v. *Bank of Italy,* 60 Cal.App. 602 [214 P. 61];

782

*Gettman* v. *City of Los Angeles Dept. of W. & P.*, 87 Cal. App.2d 862, 865-866 [197 P.2d 817].) ██ It is also the rule that in the case of an insurance policy on the husband's life purchased with community funds, any change in the beneficiary away from the wife without her consent, and without a valuable consideration other than substitution of beneficiaries, is voidable in its entirety by her during her husband's lifetime. (*Benson* v. *City of Los Angeles,* 60 Cal. 2d 355, 363 [33 Cal.Rptr. 257, 384 P.2d 649]; *Sieroty* v. *Silver,* 58 Cal.2d 799, 803 [26 Cal.Rptr. 635, 376 P.2d 563]; *Tyre* v. *Aetna Life Ins. Co.,* 54 Cal.2d 399, 404 [6 Cal.Rptr. 13, 353 P.2d 725]; *Britton* v. *Hammell,* 4 Cal.2d 690, 692 [52 P.2d 221].) ██ However, the wife is limited to the recovery of her one-half share after her husband's death although she is not a named beneficiary. (*Benson* v. *City of Los Angeles, supra,* at p. 363; *Tyre* v. *Aetna Life Ins. Co., supra,* at p. 405; *Grimm* v. *Grimm,* 26 Cal.2d 173, 175 [157 P.2d 841]; *New York Life Ins. Co.* v. *Bank of Italy, supra,* 60 Cal.App. 602, 607.) ██ The rationale of the latter cases is that the husband's testamentary power validates the gift of his half interest. (*Benson* v. *City of Los Angeles, supra,* at p. 363; *Tyre* v. *Aetna Life Ins. Co., supra,* at p. 405.) ██ Failure to compute and allocate the proper shares between community and separate property is reversible error. (*Field* v. *Bank of America, supra,* 100 Cal.App.2d 311, 314-315.) Turning to the case at bench, we have the following facts pertinent to the apportionment made by the trial court.

Mrs. Phillips was the only witness who testified concerning the amount of premiums deducted from Percy's salary. She stated that he had accidental death and dismemberment insurance and accident and health insurance with Equitable, in addition to the life insurance; that the premiums on all the insurance were paid for through one deduction but in different amounts for each. Testifying from company payroll registers she stated that certain weekly deductions had been taken from Percy's salary for insurance purposes, but that she did not know the amount or breakdown of any of the deductions made. She also stated that Colgate contributed a part of each employee's insurance cost, and that she believed it was twice the amount the employee contributed. On cross-examination, however, she admitted that she had no knowledge of the amounts contributed by Colgate. Mrs. Phillips was recalled to the stand and was allowed to testify from a

rate book[8] sent out by Colgate's home office in New York. When she testified from the payroll register, she stated that the sum of 71 cents a week was deducted from Percy's earnings from February 2, 1948, until October 4, 1948, and 69 cents from October 4, 1948, until April 1, 1954. In testifying from the booklet she stated that the deductions were 69 cents a week from February 1, 1949 to January 31, 1950. On the basis of this rate book, the witness testified as follows: from February 2, 1948, to April 1, 1954, Percy's monthly insurance deduction was $2.98, of which $1.80 was credited to life insurance. The deduction for life insurance was 60 cents a month per thousand. Since at that time Percy had $3,000 of life insurance, the total monthly cost was $1.80. It was also shown that of the $2.98 amount, seven and a half cents per month per thousand was credited to accident and death and dismemberment insurance and 40 cents per month per thousand on health insurance. However, no testimony was elicited showing the total of the premiums paid for such insurance. From April 1, 1954, to April 1, 1959, the total or actual monthly cost of life insurance was $5.40, computed on the basis of 90 cents per thousand, of which sum $4.00 represented a deduction from Percy's salary. The policy limits were increased to $6,000 on April 1, 1954, and to $6,500 on April 1, 1956. From April 1, 1959, until Percy's death in 1961 the monthly cost of insurance was $4.68, computed on a basis of 72 cents per thousand, or $4.68, of which sum $3.78 was deducted from Percy's salary.

On cross-examination Mrs. Phillips stated that the $300 policy was fully paid for by Colgate, and that no deduction from Percy's salary was required. She also testified that she didn't know how much was actually paid by Colgate to the insurance company, and that while she knew the amount that was deducted from the salary of employees she did not know "the breakdown" as to the life insurance portion. Mrs. Phillips stated further that premiums paid included not only life insurance, but accident and dismemberment and weekly health benefit insurance.

Mrs. Phillips' testimony points clearly to the anomalous character of the evidence upon which the court attempted to make an apportionment. It is apparent that the witness her-

---

[8]The rate book was entitled "Employee's Group Insurance Plan," contained the employees' hourly rates, and was used to compute the salary deductions for an employee's insurance.

self had no knowledge of how much the company contributed to Percy's life insurance program, nor did she know the insurance breakdown with respect to several types of coverage. There is absolutely no evidence showing the amount of premiums paid by Colgate to Equitable for the $300 policy prior and subsequent to 1955. There can be no doubt that a portion of the proceeds of this policy was community property. While the trial court did find that *all* premiums for said policies paid by Percy were deducted from his earnings at Colgate and that premiums were also paid by Colgate for said policies which were also Percy's earnings, it did not make a finding as to what portion of these premiums went for life insurance and what portion was attributed to other insurance.[9] Further, while the court found that the amount of premiums attributable to community property was $196.60, it is apparent that the court, although finding that the premiums contributed by Colgate were Percy's earnings, failed to compute the proportionate part of these premiums contributed prior to 1955 as part of the community property share.

Inconsistencies between the findings and the evidence appear in the record as follows: Mrs. Phillips' testimony showed that $1.80 per month was deducted from Percy's salary between February 2, 1948, and April 1, 1954, for $3,000 of life insurance. She also stated that on April 1, 1954, he increased the insurance to $6,000, which continued to April 1, 1956, when he increased the insurance to $6,500. Premiums of $5.40 a month were paid during this period of which $4.00 represented the amount contributed by Percy. The court, however, found that the premium of $1.80 per month was deducted from February 2, 1948, to July 1, 1954, although the

[9]Finding of Fact No. XI reads, in pertinent part, as follows: "[T]he Court finds that that part of the proceeds of the said policies attributable to premiums paid prior to September 7, 1955, was community property; that the amount of such premiums was $196.60; and that that figure includes $1.80 per month between February 2, 1948, and July 1, 1954, for a total of $139.60, and $4.00 per month between July 1, 1954 and September 7, 1955, for a total of $57.00."

Finding of Fact No. XII reads, in pertinent part, as follows: "The Court further finds that after September 7, 1955, the premiums for the said policies were paid out of or attributable to Percy Polk's separate property; that the amount of such premiums was $282.06; and that that figure includes $4.00 per month between September 7, 1955 and April 13, 1956 for a total of $29.00, $4.36 per month between April 13, 1956 and April 1, 1959, for a total of $154.78, and $3.78 per month between April 1, 1959 and May 28, 1961 for a total of $98.28."

insurance was increased to $6,000 on April 1, 1954, and the premium deducted therefor was $4.00.[10] It is apparent, moreover, from the figures submitted, that a correct apportionment of the premiums to separate and community property cannot result in round figures. Yet the court concluded that $1,400 of the total insurance proceeds was community property and gave judgment to Alice for that amount.[11] This sum is not only irreconcilable with the court's findings, but is an incorrect adjudication of the community proceeds to which Alice would be entitled. The trial court determined that the community property portion of the insurance proceeds amounted to $1,400. Assuming *arguendo* that this apportionment was proper, Alice would only be entitled to one-half thereof, rather than the entire sum, because Percy's designation of Charles, as the named beneficiary, validated the gift of his half-interest in said proceeds under his testamentary power. (See *Benson* v. *City of Los Angeles, supra,* 60 Cal.2d 355, 363; *Tyre* v. *Aetna Life Ins. Co., supra,* 54 Cal.2d 399, 404-405.)

In view of the inconclusive evidence as to the nature and extent of the premiums allocable to life insurance and the resulting erroneous allocation of such premiums to separate and community property, the issue of apportionment will require a retrial in order to take evidence on the amount of the premiums allocable to life insurance paid by Colgate, and the amount thereof deducted from Percy's salary. Pursuant to the conclusions herein reached on the issue of abandonment, that portion of such premiums paid to Equitable prior to September 7, 1955, constitutes community property and those paid after said date are Percy's separate property. Accordingly, the proceeds of the subject insurance policies are to be apportioned in the same ratio that the amount of such community funds paid for premiums bears to the amount of separate funds paid for such purpose. Upon such apportionment Charles will be entitled to all of the proceeds determined to be separate property and one-half of the pro-

[10]Inconsistencies also appear with respect to Finding No. XII dealing with the apportionment after September 7, 1955, the effective date of the 1955 amendment. Mrs. Phillips' testimony showed that the premium was $5.40 per month between April 1, 1954 and April 1, 1959, and $4.68 per month from April 1, 1959 until Percy's death in 1961.

[11]The effect of the court's findings of fact and conclusions of law was to adjudicate that of the $6,800 insurance proceeds, $1,400 constituted community property and $5,400, Percy's separate property.

ceeds ascertained to be community property. The other half of the community proceeds shall be assigned to Alice. Alice's contention that all the proceeds of the two policies are community property because of commingling is untenable because it is apparent that the premiums allocable to separate and community property can be traced.

In view of the conclusion herein reached that the issue as to the source and allocability of the premiums must be retried, we need not pass upon the propriety of the trial court's rulings with respect to Mrs. Phillips' testimony. We should observe, however, that these objections may be obviated through the presentation of more satisfactory evidence which should be readily available to the parties. We have reference, particularly, to the records of Equitable with respect to the allocation of premiums and the subject insurance policies which were not made available to the court below. We note that considerable confusion in Mrs. Phillips' testimony was caused when she was permitted to testify from the rate book. The matters testified to from this book were at variance with her testimony from Colgate's payroll records. We are unable to ascertain from the record the basis upon which she was permitted to testify from the rate book. Suffice it to say, this book merely indicated the amount that should have been deducted from Percy's salary. The question in controversy is not the amount Colgate should have deducted but the amount it *did* deduct.

Alice's final contention is that the change of beneficiary from herself to Charles was made without her consent and therefore was ineffective. The gist of her argument is that she had an irrevocable right to the proceeds of the subject insurance of which she could not be divested unless the policy expressly gave the insured the right to change the beneficiary. She relies on *Morrison* v. *Mutual Life Ins. of New York*, 15 Cal.2d 579, 582 [103 P.2d 963]; and *Yore* v. *Booth*, 110 Cal. 238, 240-241 [42 P. 808, 52 Am.St. Rep. 81], for the rule that the naming of a beneficiary in a life insurance policy has the effect of giving that beneficiary a vested right in the policy, so that he becomes in fact the owner of the contract and is protected against any interference with his rights by later acts of the insured or the company, and the insured may in such a case neither change the beneficiary nor assign the policy, and he cannot surrender or cancel it, *unless he reserves the right*. These cases were decided prior to the enactment of an amendment to Insurance Code section

10170 which provides in essence that unless a policy specifically negates a right to change the beneficiary thereof, the insured retains the right.[12] This section cannot, however, under well-established principles applicable to the construction of statutes, be given retroactive application if it interferes with vested rights or impairs contractual obligations. (*Jones* v. *Union Oil Co.*, 218 Cal. 775, 778 [25 P.2d 5]; *McKinney* v. *Ruderman*, 203 Cal.App.2d 109, 117 [21 Cal. Rptr. 263]; *McBarron* v. *Kimball*, 210 Cal.App.2d 218, 220 [26 Cal.Rptr. 379].) In the instant case the insurance policies in question were issued prior to 1949. Accordingly, unless Percy reserved the right in said policies to change beneficiary, he could not thereafter do so, and Alice would have had a vested right therein. However, we (as was the court below) are in the dark as to the provisions of the subject policies as they were not offered or presented in evidence.

Alice argues that because the change of beneficiary was made without her knowledge and consent "and because the record discloses no right of the insured to change the beneficiary" she is entitled to all of the proceeds. The burden of proof in the instant case, however, was upon Alice. It is she who was claiming the proceeds of the insurance policies as against the named beneficiary. Accordingly, it was incumbent upon her to establish that she had the claimed vested right. This she did not do. ■ The burden of proof is on the plaintiff as to those allegations of his complaint which were placed in issue. (*Mills* v. *Vista Pools, Inc.*, 184 Cal.App.2d 668, 672 [7 Cal.Rptr. 545]; *Eley* v. *Curzon*, 121 Cal.App.2d 280, 284 [263 P.2d 86].) Section 1981 of the Code of Civil Procedure provides: "The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side." ■ Particularly applicable to the instant case is the following statement in *Reese* v. *Smith*, 9 Cal.2d 324, 328 [70 P.2d 933]: "If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary."

---

[12]Ins. Code, § 10170, in pertinent part provides: "Any such agreement may be rescinded or amended by the parties thereto without the consent of any beneficiary therein designated unless the rights of any such beneficiary have been expressly declared to be irrevocable."

■ There is still another reason why Alice cannot prevail in this contention. The issue as to the irrevocability of the policies was not presented to the trial court. Not only was no evidence adduced thereon, but it was not delineated as an issue in the pretrial conference order. All that is contained in the order, and all that was therefore before the trial court, was the statement that it was an admitted fact ''That changing the beneficiary on the policies was made by insured without knowledge and consent of the plaintiff.'' ■ The important function of the pretrial order is to define issues. (*Palmer* v. *Financial Indem. Co.*, 215 Cal.App.2d 419, 434 [30 Cal.Rptr. 204].) ■ The efficacy and effect of a pretrial conference order were aptly stated by Justice Sullivan of this court in *Feykert* v. *Hardy*, 213 Cal.App.2d 67, 74 [28 Cal.Rptr. 510], as follows: ''[A] pretrial conference order, unless modified at or before trial, supersedes the issues raised by the pleadings and controls the subsequent course of the case. [Citations.] The pretrial order limits the issues to be tried [citation] and those issues, neither raised at the pretrial conference nor designated in dispute in the pretrial conference order, are no longer issues in the case. [Citations.] .... Until presented with a request for its modification, the trial judge has a right to rely on the posture of the case defined by the pretrial conference order. [Citations.]''

The judgment and the order denying the motion to vacate the judgment are reversed and the cause is remanded for a new trial for the sole purpose of determining what portion of the insurance proceeds is community property and what is separate property, and for the apportionment thereof, in accordance with the views herein expressed. The parties shall bear their own costs on appeal.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied August 18, 1964.